UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC FRONTIER | ) | |
| FOUNDATION, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-1599 (RMC) |
| | ) | |
| OFFICE OF THE UNITED STATES | ) | |
| TRADE REPRESENTATIVE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Defendant, by its undersigned attorneys, hereby moves the Court, pursuant to Rule 56 of

the Federal Rules of Civil Procedure, for an order granting summary judgment on the grounds

that no genuine issue of material fact exists and that defendant is entitled to judgment as a matter

of law.

In support of this motion, the Court is respectfully referred to the Declaration of Warren

Maruyama, General Counsel, Office of the United States Trade Representative;[1]  to the

Declaration of Stanford McCoy, Assistant United States Trade Representative for Intellectual

Property and Innovation, Office of the United States Trade Representative; to Defendant's

Statement of Material Facts as to Which There is No Genuine Issue, Pursuant to Local Civil

_____

[1] Although no longer with the Office of the United States Trade Representative, Mr.
Maruyama was General Counsel of that Office at the time his declaration was executed.

-2-

Rule 7(h); and to the Memorandum of Points and Authorities in Support of Defendant's Motion

for Summary Judgment, all filed herewith.

Respectfully submitted,


_____

JEFFREY A. TAYLOR
(DC Bar #498610)
United States Attorney


_____

RUDOLPH CONTRERAS
(DC Bar #434122)
Assistant United States Attorney


_____/s/_____

Dated:  May 28, 2009          Vanessa R. Brinkmann
                              Attorney-Advisor
                              Office of Information Policy
                              United States Department of Justice
                              1425 New York Ave., N.W., Suite 11050
                              Washington, D.C.  20530-0001
                              (202) 616-5462

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC FRONTIER<br>    FOUNDATION, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-1599 (RMC) |
| | ) | |
| OFFICE OF THE UNITED STATES<br>    TRADE REPRESENTATIVE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH
<u>THERE IS NO GENUINE ISSUE, PURSUANT TO LOCAL CIVIL RULE 7(h)</u>

Pursuant to Local Civil Rule 7(h), defendant submits the following statement of material

facts as to which there is no genuine issue:

1. In May 2006, negotiators in the Office of the United States Trade Representative

(USTR), acting on behalf of the United States and building upon the government's prior efforts to

combat international piracy and counterfeiting, began discussions with foreign governments to

negotiate a multilateral Anti-Counterfeiting Trade Agreement (ACTA).  (<u>See</u> Declaration of

Warren Maruyama, General Counsel, USTR [hereinafter Maruyama Decl.],[1] filed herewith, ¶ 3;

Declaration of Stanford McCoy, Assistant United States Trade Representative (AUSTR) for

Intellectual Property and Innovation, USTR [hereinafter McCoy Decl.], filed herewith, ¶ 3-7.)

Since that time, USTR negotiators have engaged in four rounds of discussions with the

governments of Australia, Canada, the European Union and its Member States, Japan, Korea,

---

[1] Although no longer with USTR, Mr. Maruyama was General Counsel at the time his
declaration was executed.

1

-2-

Mexico, Morocco, New Zealand, Singapore, and Switzerland.  (See Maruyama Decl. ¶ 3; McCoy Decl. ¶ 6-10.)

2.  The ACTA negotiations reflect a collective effort among theses trading partners to establish a more effective international framework for combating piracy and counterfeiting.  (See Maruyama Decl. ¶ 6; McCoy Decl. ¶¶ 6-10.)  Piracy and counterfeiting are a growing trade policy concern to the United States, and USTR believes that a favorable outcome to the ACTA negotiations is in the economic interest of the United States.  (See Maruyama Decl. ¶ 3.)  When it is finalized, the ACTA is intended to assist the efforts of governments around the world to more effectively combat the proliferation of counterfeit and pirated goods, which USTR views as undermining legitimate trade and the sustainable development of the world economy, and in some cases contributing to organized crime and exposing American citizens to potentially dangerous fake products.  (See McCoy Decl. ¶ 6-10.)

3.  In December 2007, prior to circulating formal textual proposals for the ACTA, the United States and the other governments participating in the ACTA negotiations agreed that "documents relating to the proposed [ACTA] will be held in confidence."  (See Maruyama Decl. ¶ 4 & Attach. A; McCoy Decl. ¶ 6-10)  This confidentiality agreement was designed to enable officials of participating governments to engage in frank exchanges of views, positions, and specific negotiating proposals.  (See Maruyama Decl. ¶ 6.)  USTR frequently agrees in writing with its partners in major trade negotiations, such as the ACTA, to keep negotiating records confidential.  (McCoy Decl. ¶ 6-10.)

4.  On February 8, 2008, based on the confidentiality agreement between the United States and its negotiating partners, Mr. Maruyama issued a memorandum to USTR's ACTA

-3-

negotiators, noting that the governments participating in the ACTA negotiations had agreed to hold documents exchanged in the course of those negotiations in confidence, and directing that all such documents were to be classified pursuant to Executive Order 12,958, as amended, at the "Confidential" level as "Foreign Government Information" in accordance with that confidentiality agreement.  (See Maruyama Decl. ¶ 4 & Attach. B).

     5.  In order to develop the United States' position on international negotiations, and based on its past experience in negotiating free trade agreements and conducting multilateral intellectual property negotiations, USTR has engaged in an extensive consultative process within the Executive Branch.  USTR has identified those agencies that have key interests in a given policy area under negotiation, and has consulted with those agencies to prepare a draft negotiating text that is then circulated to the interagency Trade Policy Staff Committee (TPSC).[2] (See McCoy Decl. ¶ 9.)  As a part of this inter-agency consultative process, these agencies may offer comments on draft text, which may in turn lead to an additional round of drafting within USTR.  (See id.)

     6.  In addition to its inter-agency consultative process and in order to develop the United States' position on international negotiations, USTR engages, on behalf of the President, in a statutorily-mandated consultative process in which Congress has required the President to seek information and advice from representative elements of the private sector with respect to, among other things, the development, implementation, and administration of United States trade policy. See 19 U.S.C. § 2155(a)(1)(C); McCoy Decl. ¶¶ 6-10.  Specifically, the Trade Act of 1974

---

    [2] The TPSC, comprised of nineteen federal agencies and offices, makes up the sub-cabinet level mechanism for developing and coordinating U.S. Government positions on international trade and trade-related investment issues.  (See McCoy ¶ 9.)

-4-

directs the President to establish "such sectoral or functional advisory committees as may be appropriate" and which are representative of "all industry, labor, agricultural, or service interests." See 19 U.S.C. § 2155(c)(2). The Trade Act of 1974 further directs that these Presidential advisory committees meet upon request of the United States Trade Representative and provide "policy advice, technical advice and information, and advice on other factors." See 19 U.S.C. § 2155(d).

7. In accordance with the Trade Act of 1974, the President has established the Industry Trade Advisory Committee (ITAC) system, which includes committees devoted to specific trade-related areas. (See McCoy Decl. ¶ 15-18.) The members of advisory committees receive security clearances from the government and are referred to as "cleared advisors." (See id..)

8. To solicit views from cleared advisors, USTR posts documents on a secure website, and individual cleared advisors then access the documents and provide comments directly to individual USTR officials. (See id.) Cleared advisors' comments may range from technical comments on wording choices in draft negotiating texts to comments on overall intellectual property international trade policy. (See id.)

9. The Industry Trade Advisory Committee 15 (ITAC-15) is focused on intellectual property rights and its members include representatives from the software, recording, movie, and publishing industries, as well as the Global Health Council. (See id.)

10. The Trade Act of 1974, in establishing the advisory committee system, also specifies the circumstances under which information or advice submitted in confidence to the United States government, or to an advisory committee itself, can be disclosed. See 19 U.S.C. § 2155(g); McCoy Decl. ¶ 15-18. The statute provides that the information or advice may be

-5-

disclosed to certain government officials, certain Congressional officials, and the advisory

committees themselves.  See id.

11.  USTR has implemented, and the cleared advisors have participated in, the advisory

committee system with an understanding that communications exchanged would be held in

confidence.  (See McCoy Decl. ¶ 15-18.)  This understanding is based on the language of the

statute itself, as well as on the legislative background of the Trade Act of 1974.  (See id.)

Specifically, USTR recognized the confidentiality of the cleared advisor system in keeping the

language of subsection (g) of the statute described above, and on the statements of the Senate

Finance Committee which include the following:

> The Committee is aware that this subparagraph would establish a limited statutory
> exemption to the Freedom of Information Act, as amended.  It is the view of the
> Committee, however, that this exception is necessary due to the nature of the
> information involved and the adverse impact which such information could have on
> the ability of the United States effectively to carry out the multilateral trade
> negotiations.

See Senate Report No. 93-1298, reprinted in 93 U.S.C.C.A.N. 7186, 7251; McCoy Decl. ¶ 15-18.

12.  In the course of its ACTA negotiations, and on behalf of the President pursuant to the

requirements of the Trade Act of 1974, USTR has solicited views from the ITAC-15 cleared

advisors by posting draft negotiating texts on a secure cleared advisor website.  (See McCoy

Decl. ¶ 15-18.)  After reviewing the documents, a number of the cleared advisors provided USTR

with comments on those documents, and in some cases on the negotiations more broadly.  (See

id.)  Advisors from other advisory committees also have access to these texts, and some have

provided comments to USTR.  (See id.)

13.  In addition to its use of the mandatory cleared advisor system, USTR also issued a

-6-

Federal Register notice on February 15, 2008 inviting public comment on the ACTA to ensure

that other organizations have an opportunity to comment on ACTA, and numerous organizations

submitted comments.  See 73 Fed. Reg. 8910 (February 15, 2008); id. ¶ 18.  In addition, USTR

has held meetings with a wide range of companies, trade associations representing a variety of

interests, and numerous non-governmental organizations upon request, and has taken the diverse

points of view of those entities into consideration in formulating policy relating to ACTA,

including the draft negotiating texts.  (See id.)  To the extent that they wish to comment publicly,

the cleared advisors may also respond in a public fashion to the Federal Register notice.  (See

McCoy Decl. ¶ 18.)

    14.   On April 6, 2009, the ACTA negotiating parties released a summary of the proposals

currently under consideration.  (See id. ¶ 8.)

    15.   By letter dated June 11, 2008, plaintiffs submitted a Freedom of Information Act

(FOIA) request to USTR, seeking certain USTR documents pertaining to the ACTA.  (See id.

¶ 19.)   On July 24, 2008, pursuant to a conversation with USTR staff in which plaintiffs agreed

to narrow their request, plaintiffs submitted a modified FOIA request to USTR.  (See id. &

Attach. E.)

    16.   In response to plaintiffs' FOIA request, USTR staff conducted a manual search of its

paper records for records responsive to plaintiffs' FOIA request.  (See McCoy Decl. ¶ 29-30.)

    17.   In addition to its search of paper files, USTR conducted a search designed to yield all

e-mails responsive to plaintiffs' FOIA request.  (See id.)  In conducting this search, USTR

initially searched for all records containing the term "ACTA," and that search yielded

approximately 30,000 e-mails.  (See id.)  Accordingly, and upon consultation with plaintiffs,

-7-

USTR then refined its results by searching the subject lines of the 30,000 e-mails located using the terms "text," "civil," "criminal," "internet," "border," "statutory damages," and "anti-circumvention"in the subject lines of the e-mails.  (See id.)

18.  As a result of its records searches, USTR identified 1,454 pages of material responsive to plaintiffs' FOIA request. (See id.)

19.   Plaintiff commenced this action on September 17, 2008 seeking the expedited production of all records responsive to its FOIA request.  (See Compl. ¶ 1.)

20.  On November 14, 2008, USTR provided its first interim response to plaintiffs.  (See McCoy Decl. ¶ 22 & Attach. A.)  Pursuant to this response, USTR disclosed fifty-four documents to plaintiffs.  (See id.)  Additionally, USTR advised that it was awaiting input from third-parties to determine whether additional documents could be disclosed, and that a final response would be provided to plaintiffs to indicate whether any records would be withheld, and the basis for such withholding.  (See id.)

21.  In a Joint Proposed Records Processing and Briefing Schedule filed on November 21, 2008, the parties informed the Court that they had agreed to a processing schedule, by which USTR would provide an interim response to plaintiffs FOIA request by December 22, 2008. (See Joint Schedule, filed Nov. 21, 2008.)  The parties also agreed that USTR would complete its processing of plaintiffs' FOIA request and provide plaintiffs with a final response to its request by January 16, 2009, and would provide plaintiffs with a draft Vaughn Index for any withheld documents by January 23, 2009.  (See id.)

22.  On December 22, 2008, USTR provided its second interim response to plaintiffs. (See McCoy Decl. ¶ 23 & Attach. B.)  Pursuant to this response, USTR advised plaintiffs that it

-8-

had completed the review of 806 pages of records responsive to plaintiffs' FOIA request, and that

313 pages were being withheld in full pursuant to Exemption 1 of the FOIA, 5 U.S.C.

§ 552(b)(1).  (See id.)  Moreover, USTR advised plaintiffs that 186 email chains, totaling 493

pages, were being withheld in full pursuant to Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5),

and noted that Exemption 1 might also apply to these e-mails.[3]  (See id.)  Finally, USTR advised

that, to the extent the withheld information contained private e-mail addresses, such information

was also protected by Exemption 6 of the FOIA, 5 U.S.C. § 552(b)(6).  (See id.)

        23.  On January 16, 2009, USTR provided its final response to plaintiffs.  (See McCoy

Decl. ¶ 24 & Attach. C.)  Pursuant to this response, USTR disclosed an additional fourteen pages

of documents, four of which were redacted pursuant to Exemptions 5 and 6 of the FOIA,

5 U.S.C. § 552(b)(5), (b)(6).  (See id.)  In addition, USTR advised that 580 pages were being

withheld in full pursuant to Exemptions 1 and 5 of the FOIA.  (See id.)

        24.  By e-mail dated January 23, 2009, the undersigned transmitted USTR's draft Vaughn

Index to plaintiffs' counsel.

        25.  On January 30, 2009, in light of a development in Executive Branch FOIA policy --

specifically, the issuance to the heads of federal departments and agencies of a January 21, 2009

memorandum on the FOIA from President Obama -- the parties, at plaintiffs' request, filed a

Joint Motion to Stay Proceedings and Amend Briefing Schedule with the Court.  (See Joint

Motion, filed Jan. 30, 2009.)  On February 3, 2009, the Court approved the parties' motion to stay

proceedings until thirty days after such time as the Attorney General issues guidelines pursuant to

---

        [3] In its final response dated January 16, 2009, USTR advised plaintiff that it had
determined that 486 pages of these records were in fact protected by Exemption 1, in addition to
Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5).  (See McCoy Decl. 24 Attach. E.)

-9-

the President's January 21, 2009 memorandum on the FOIA, but no later than June 30, 2009.
(See id.)  The Court further ordered defendant, upon issuance of the Attorney General's
guidelines on the FOIA, to review its determinations on the documents at issue and inform
plaintiffs of any changes to its prior determinations.  (See id.)  Finally, the Court ordered the
parties to confer and advise the Court in a jointly filed status report as to the remaining issues to
be resolved and proposed amendments to the briefing schedule, to be filed within thirty days of
the issuance of the Attorney General's guidelines.  (See id.)

26.  The Attorney General issued his guidelines on the Freedom of Information Act in a
memorandum dated March 19, 2009.  See Attorney General Holder's Memorandum for Heads of
Executive Departments and Agencies Concerning the Freedom of Information Act (Mar. 19,
2009) [hereinafter Attorney General Holder's FOIA Guidelines], available at
http://www.usdoj.gov/ag/foia-memo-march2009.pdf.

27.  In accordance with the Court's February 3, 2009 Order, and in light of the Attorney
General's FOIA Guidelines, USTR conducted a "re- review" of the documents, including e-mails,
which it had previously withheld in full or in part from plaintiffs, in order to determine whether
any material was appropriate for discretionary release.  (See McCoy Decl. ¶ 23.)  In the course of
this review, USTR engaged in extensive internal discussions, discussions with other Executive
Branch officials, and discussions with the ITAC cleared advisors in an effort to assess the harm
in releasing any additional information, and to evaluate whether any records could be segregated
for release.  (See id.)

28.  On April 30, 2009, USTR advised plaintiffs that its re-review of the previously
withheld records was completed, and released an additional thirty-six pages to plaintiffs, with

-10-

excisions made pursuant to Exemptions 1, 2, and 5 of the FOIA 5 U.S.C. § 552(b)(1), (b)(2), (b)(5).[4]  (See id. ¶ 27 & Attach. D.)  This disclosure also included material that, while not strictly responsive to plaintiff's request, USTR nonetheless disclosed as a matter of courtesy.  (See id.)

29.  Subsequent to its April 30, 2009 supplemental disclosure, USTR determined that some of the withheld records were also protected by Exemption 3 of the FOIA.

30.  Attached to Mr. McCoy's declaration is a Vaughn Index containing a detailed description of the withheld documents.  (See McCoy Decl. Attach. E.)  Because certain records are similar to one another, USTR has categorized them into nine distinct groups.  (See id.)  The Vaughn Index describes the responsive documents contained in each group, including such information as the date and the general content of the material, provides the number of pages for each group, and identifies the FOIA Exemptions and, for documents protected pursuant to Exemption 5 of the FOIA, the civil discovery privileges, pursuant to which USTR withheld the records in full or part.  (See id.)

31.  In sum, all that remains at issue are USTR's application of Exemptions 1, 2, and 3, 5 U.S.C. § 552(b)(1), (b)(2), (b)(3), and its application of Exemption 5 (attorney-client and deliberative process privileges), 5 U.S.C. § 552(b)(5), to the 1362 pages of documents identified in Groups 1-9 of the Vaughn Index.[5]  (See McCoy Decl. Attach. E.)

---

[4] This supplemental disclosure included a document prepared by USTR for the TPSC to launch the ACTA negotiations.  (See McCoy Decl. ¶ 27.)

[5] Pursuant to the parties' agreement as reflected in a Joint Motion on January 30, 2009, plaintiffs have advised that they will not challenge the application of Exemption 6 to the documents at issue.  (See Joint Motion, filed Jan. 30, 2009.)

-11-

32.  USTR has reviewed each page of the responsive records at issue, and has determined that all reasonably segregable information has been disclosed to plaintiffs.  (See Maruyama ¶ 9; McCoy ¶¶ 39-46, 51-68.)  In fact, USTR has obtained the consent of participating governments to release certain ACTA documents, such as agendas and the confidentiality agreement itself, to the public, and consulted extensively with other agencies in order to release any non-exempt information to plaintiffs.  (See id.)  USTR has also made a discretionary release of

-12-

thirty-six pages pursuant to its April 30, 2009 supplemental response to plaintiffs.[6]  (See McCoy

¶ 24.)

Respectfully submitted,


_____
JEFFREY A. TAYLOR
(D.C. Bar #498610)
United States Attorney



_____
RUDOLPH CONTRERAS
(D.C. Bar #434122)
Assistant United States Attorney



                            /s/
                     _____
Dated:  May 28, 2009        VANESSA R. BRINKMANN
                            Attorney-Advisor
                            United States Department of Justice
                            Office of Information Policy
                            1425 New York Ave., N.W., Suite 11050
                            Washington, D.C.  20530-0001
                            (202) 616-5462

                            Counsel for Defendant

_____

[6]  This supplemental disclosure included a document prepared by USTR for the TPSC to launch the ACTA negotiations, the first time a "TPSC paper" has been released.  (See McCoy Decl. ¶ 24.)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC FRONTIER | ) | |
| FOUNDATION, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-1599 (RMC) |
| | ) | |
| OFFICE OF THE UNITED STATES | ) | |
| TRADE REPRESENTATIVE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

MEMORANDUM OF POINTS OF AUTHORITIES IN
SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Preliminary Statement

Plaintiffs filed this action on September 17, 2008, pursuant to the Freedom of Information

Act (FOIA), 5 U.S.C. § 552 (2006), amended by OPEN Government Act of 2007, Pub. L. No.

110-175, 121 Stat. 2524, seeking access to certain agency records pertaining to the Anti-

Counterfeiting Trade Agreement (ACTA), maintained by defendant Office of the United States

Trade Representative (USTR).  Defendant USTR now moves for summary judgment in this

action on the ground that no information has been improperly withheld from plaintiffs.  In

support of its motion, defendant has filed herewith the Declarations of Warren Maruyama,

General Counsel of USTR [hereinafter Maruyama Decl.],[1] and of Stanford McCoy, Assistant

United States Trade Representative (AUSTR) for Intellectual Property and Innovation, USTR

[hereinafter McCoy Decl.].

Defendant's supporting declarations, attached hereto, recount the chronology related to

---

[1] Although he is no longer with USTR, Mr. Maruyama was USTR's General Counsel at
the time his declaration was executed.

-2-

the administrative processing of plaintiffs' FOIA request, identify the documents at issue, and fully describe and justify the information withheld by defendant pursuant to Exemptions 1, 2, 3, and 5 of the FOIA, 5 U.S.C. § 552(b)(1), (b)(2), (b)(3), (b)(5).

On the basis of these declarations, the accompanying exhibits and <u>Vaughn</u> Index, the entire record herein, and for the reasons set forth below, defendant respectfully submits that there exists no genuine issue of material fact and that the defendant is entitled to judgment as a matter of law pursuant to Rule 56 of the Federal Rules of Civil Procedure.

<u>Factual and Procedural Background</u>

I.     <u>The Anti-Counterfeiting Trade Agreement</u>

In May 2006, negotiators in the Office of the United States Trade Representative (USTR), acting on behalf of the United States and building upon the government's prior efforts to combat international piracy and counterfeiting, began discussions with foreign governments to negotiate a multilateral Anti-Counterfeiting Trade Agreement (ACTA).  (<u>See</u> Declaration of Warren Maruyama, General Counsel, USTR [hereinafter Maruyama Decl.], filed herewith, ¶ 3; Declaration of Stanford McCoy, Assistant United States Trade Representative (AUSTR) for Intellectual Property and Innovation, USTR [hereinafter McCoy Decl.], filed herewith, ¶ 3-7.) Since that time, USTR negotiators have engaged in four rounds of discussions with the governments of Australia, Canada, the European Union and its Member States, Japan, Korea, Mexico, Morocco, New Zealand, Singapore, and Switzerland.  (<u>See</u> Maruyama Decl. ¶ 3; McCoy Decl. ¶ 7.)

The ACTA negotiations reflect a collective effort among theses trading partners to establish a more effective international framework for combating piracy and counterfeiting.  (<u>See</u>

-3-

Maruyama Decl. ¶ 3; McCoy Decl. ¶¶ 6-10.)  Piracy and counterfeiting are a growing trade

policy concern to the United States, and USTR believes that a favorable outcome to the ACTA

negotiations is in the economic interest of the United States.  (See McCoy Decl. ¶¶ 6-10.)  When

it is finalized, the ACTA is intended to assist the efforts of governments around the world to

more effectively combat the proliferation of counterfeit and pirated goods, which USTR views as

undermining legitimate trade and the sustainable development of the world economy, and in

some cases contributing to organized crime and exposing American citizens to potentially

dangerous fake products.  (See McCoy Decl. ¶¶ 6-10.)

In December 2007, prior to circulating formal textual proposals for the ACTA, the United

States and the other governments participating in the ACTA negotiations agreed that "documents

relating to the proposed [ACTA] will be held in confidence."  (See Maruyama Decl. ¶ 4 &

Attach. A; McCoy Decl. ¶¶ 6-10.)  This confidentiality agreement was designed to enable

officials of participating governments to engage in frank exchanges of views, positions, and

specific negotiating proposals.  (See Maruyama Decl. ¶ 6.)  USTR frequently agrees in writing

with its partners in major trade negotiations, such as the ACTA, to keep negotiating records

confidential.  (McCoy Decl. ¶¶ 6-10.)

On February 8, 2008, based on the confidentiality agreement between the United States

and its negotiating partners, Mr. Maruyama issued a memorandum to USTR's ACTA negotiators,

noting that the governments participating in the ACTA negotiations had agreed to hold

documents exchanged in the course of those negotiations in confidence, and directing that all

such documents were to be classified pursuant to Executive Order 12,958, as amended, at the

"Confidential" level as "Foreign Government Information" in accordance with that

-4-

confidentiality agreement.  (See Maruyama Decl. ¶ 4 & Attach. B).

On April 6, 2009, the ACTA negotiating parties released a summary of the proposals currently under consideration.  (See McCoy Decl. ¶ 10.)

II.     The Industry Trade Advisory Committee System

In addition to its inter-agency consultative process and in order to develop the United States' position on international negotiations, USTR engages, on behalf of the President, in a statutorily-mandated consultative process in which Congress has required the President to seek information and advice from representative elements of the private sector with respect to, among other things, the development, implementation, and administration of United States trade policy. See 19 U.S.C. § 2155(a)(1)(C); McCoy Decl. ¶¶ 15-18.  Specifically, the Trade Act of 1974 directs the President to establish "such sectoral or functional advisory committees as may be appropriate" and which are representative of "all industry, labor, agricultural, or service interests."  See 19 U.S.C. § 2155(c)(2).  The Trade Act of 1974 further directs that these Presidential advisory committees meet upon request of the United States Trade Representative and provide "policy advice, technical advice and information, and advice on other factors."  See 19 U.S.C. § 2155(d).

In accordance with the Trade Act of 1974, the President has established the Industry Trade Advisory Committee (ITAC) system, which includes committees devoted to specific trade-related areas.  (See McCoy Decl. ¶¶ 15-18.)   The members of advisory committees receive security clearances from the government and are referred to as "cleared advisors."  (See id. ¶ 16.)

To solicit views from cleared advisors, USTR posts documents on a secure website, and individual cleared advisors then access the documents and provide comments directly to individual USTR officials.  (See id.)

-5-

The Industry Trade Advisory Committee 15 (ITAC-15) is focused on intellectual property rights and its members include representatives from the software, recording, movie, and publishing industries, as well as the Global Health Council.  (See id.)  In the course of its ACTA negotiations, and on behalf of the President pursuant to the requirements of the Trade Act of 1974, USTR has solicited and received views from the ITAC-15 cleared advisors by posting draft negotiating texts on a secure cleared advisor website.  (See id.)

In addition to its use of the cleared advisor system, USTR also issued a Federal Register notice on February 15, 2008 inviting public comment on the ACTA, and has held meetings with a wide range of companies, trade associations representing a variety of interests, and numerous non-governmental organizations upon request, and has taken the diverse points of view of those entities into consideration in formulating policy relating to ACTA, including the draft negotiating texts.  (See id. ¶ 18.)  To the extent that they wish to comment publicly, the cleared advisors may also respond in a public fashion to the Federal Register notice.  (See id.)

III.    The FOIA Request

By letter dated June 11, 2008, plaintiffs submitted a FOIA request to USTR, seeking certain USTR documents pertaining to the ACTA.  (See id. ¶ 19.)   On July 24, 2008, pursuant to a conversation with USTR staff in which plaintiffs agreed to narrow their request, plaintiffs submitted a modified FOIA request to USTR.  (See id.)

In response to plaintiffs' FOIA request, USTR staff conducted a manual search of its paper records, and an electronic search of its e-mails, for responsive records.  (See id. ¶¶ 29-30).  As a result of its records searches, USTR identified 1,454 pages of material responsive to plaintiffs' FOIA request. (See id.)

On November 14, 2008, USTR provided its first interim response, in which it disclosed

-6-

fifty-four documents, to plaintiffs.  (See id. ¶ 22 & Attach. A.)

In a Joint Proposed Records Processing and Briefing Schedule filed on November 21,

2008, the parties informed the Court that they had agreed to a processing schedule, by which

USTR would provide an interim response to plaintiffs FOIA request by December 22, 2008.

(See Joint Schedule, filed Nov. 21, 2008.)  The parties also agreed that USTR would complete its

processing of plaintiffs' FOIA request and provide plaintiffs with a final response to its request

by January 16, 2009, and would provide plaintiffs with a draft Vaughn Index for any withheld

documents by January 23, 2009.  (See id.)

On December 22, 2008, USTR provided its second interim response to plaintiffs, in

which 313 pages were withheld in full pursuant to Exemption 1 of the FOIA, 5 U.S.C.

§ 552(b)(1), and 186 email chains, totaling 493 pages, were withheld in full pursuant to

Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5).[2]  (See McCoy Decl. ¶ 23 & Attach. B.)  Finally,

USTR advised that, to the extent the withheld information contained private e-mail addresses,

such information was also protected by Exemption 6 of the FOIA, 5 U.S.C. § 552(b)(6).  (See

id.)

On January 16, 2009, USTR provided its final response to plaintiffs, in which it disclosed

an additional fourteen pages of documents, four of which were redacted pursuant to Exemptions

5 and 6 of the FOIA, 5 U.S.C. § 552(b)(5), (b)(6).  (See McCoy Decl. ¶ 24 & Attach. C.)  In

addition, USTR advised plaintiffs that an additional 580 pages were being withheld in full

pursuant to Exemptions 1 and 5 of the FOIA, 5 U.S.C. § 552(b)(1).  (See id.)

_____

[2] USTR also advised plaintiffs that Exemption 1 might also apply to these e-mails.  (See
McCoy Decl. ¶ 23 & Attach. B.)  In its final response dated January 16, 2009, USTR advised
plaintiff that it had determined that 486 pages of these records were in fact protected by
Exemption 1, in addition to Exemption 5 of the FOIA.  (See id. ¶ 24.)

-7-

By e-mail dated January 23, 2009, the undersigned transmitted USTR's draft <u>Vaughn</u>
Index to plaintiffs' counsel.

On January 30, 2009, in light of a development in Executive Branch FOIA policy --
specifically, the issuance to the heads of federal departments and agencies of a January 21, 2009
memorandum on the FOIA from President Obama -- the parties filed a Joint Motion to Stay
Proceedings and Amend Briefing Schedule with the Court.  (<u>See</u> Joint Motion, filed Jan. 30,
2009.)  On February 3, 2009, the Court approved the parties' motion to stay proceedings until
thirty days after such time as the Attorney General issues guidelines pursuant to the President's
January 21, 2009 memorandum on the FOIA and further ordered defendant, upon issuance of the
Attorney General's guidelines on the FOIA, to review its determinations on the documents at
issue and inform plaintiffs of any changes to its prior determinations.  (<u>See</u> <u>id.</u>)

The Attorney General issued his guidelines on the Freedom of Information Act in a
memorandum dated March 19, 2009.  <u>See</u> Attorney General Holder's Memorandum for Heads of
Executive Departments and Agencies Concerning the Freedom of Information Act (Mar. 19,
2009) [hereinafter Attorney General Holder's FOIA Guidelines], available at
<u>http://www.usdoj.gov/ag/foia-memo-march2009.pdf</u>.

In accordance with the Court's February 3, 2009 Order, and in light of the Attorney
General's FOIA Guidelines, USTR conducted a "re- review" of the documents which it had
previously withheld in full or in part from plaintiffs, in order to determine whether any material
was appropriate for discretionary release.  (<u>See</u> McCoy Decl. ¶¶ 26-27.)  In the course of this
review, USTR engaged in extensive internal discussions, discussions with other Executive
Branch officials, and discussions with the ITAC-15 cleared advisors in an effort to assess the

-8-

harm in releasing any additional information, and to evaluate whether any records could be segregated for release.  (See id.)

On April 30, 2009, USTR advised plaintiffs that its re-review of the previously withheld records was completed, and released an additional thirty-six pages to plaintiffs, with excisions made pursuant to Exemptions 1, 2, and 5 of the FOIA 5 U.S.C. § 552(b)(1), (b)(2), (b)(5).  (See id. ¶ 27 & Attach. D.)  This disclosure also included material that, while not strictly responsive to plaintiff's request, USTR nonetheless disclosed as a matter of courtesy.  (See id.)

Subsequent to its April 30, 2009 supplemental disclosure, USTR determined that some of the withheld records were also protected by Exemption 3 of the FOIA.

In sum, all that remains at issue are USTR's application of Exemptions 1, 2, and 3, 5 U.S.C. § 552(b)(1), (b)(2), (b)(3), and its application of Exemption 5 (attorney-client and deliberative process privileges), 5 U.S.C. § 552(b)(5), to the 1362 pages of documents identified in Groups 1-9 of defendant's Vaughn Index.[3]  (See McCoy Decl. Attach. E.)

<u>Argument</u>

SUMMARY JUDGMENT FOR DEFENDANT IS PROPER INASMUCH AS
<u>NO INFORMATION HAS BEEN IMPROPERLY WITHHELD FROM PLAINTIFFS</u>

Defendant has properly reviewed all 1362 pages of records which remain at issue and has determined that the withheld information is properly protected under the FOIA.  No information has been improperly withheld from plaintiffs.  Defendant's declarations comply with the statutory requirements of the FOIA, and the requirements of <u>Vaughn v. Rosen</u>, 484 F.2d 820, 827 (D.C.

---

[3] Pursuant to the parties' agreement as reflected in a Joint Motion on January 30, 2009, plaintiffs have advised that they will not challenge the application of Exemption 6 to the documents at issue.  (See Joint Motion, filed Jan. 30, 2009.)

-9-

Cir. 1973), in that they contain a complete description of, and justification for, all the information

the defendant withheld under the FOIA pursuant to Exemptions 1, 2, 3, and 5, 5 U.S.C.

§ 552(b)(1), (b)(2), (b)(3), (b)(5).

Attached to Mr. McCoy's declaration is a Vaughn Index containing a detailed description

of the withheld documents.  (See McCoy Decl. ¶ 28 & Attach. E.)  Because certain records are

similar to one another, USTR has categorized them into nine distinct groups.  (See id.)  The

Vaughn Index describes the responsive documents contained in each group, including such

information as the date and the general content of the material, provides the number of pages for

each group, and identifies the FOIA Exemptions and, for documents protected pursuant to

Exemption 5 of the FOIA, the civil discovery privileges, pursuant to which USTR withheld the

records in full or part.  (See id.)

USTR has determined that all of the classified information in the records contained in

Groups 1, 3, 5, 7, 8, and 9, and the portions of the documents containing classified information in

Groups 2 and 6, are properly classified and are protected by Exemption 1 of the FOIA.  (See id.

¶¶ 32-46.)  Additionally, USTR has determined that the contact information of individual USTR

officials contained in these records is properly protected by Exemption 2 of the FOIA in that they

are purely internal, and their disclosure could risk circumvention of the law.  (See id. ¶¶ 47-48.)

Moreover, USTR has determined that all of the records in Group 8 are properly protected by

Exemption 3 of the FOIA inasmuch as they are exempted from disclosure by the Trade Act of

1974, 19 U.S.C. § 2155.  (See id.)  Finally, USTR has determined that all of the records in

Groups 2 and 8, and portions of the records in Groups  3, 4, 6, and 9, are properly protected by

the attorney-client and deliberative process privileges of Exemption 5 of the FOIA in that they

-10-

reflect confidential communications between USTR are agency counsel, and/or are predecisional, deliberative discussions regarding ACTA negotiations.  (See id. ¶¶ 49-50.)  As is demonstrated below, the determinations by USTR on each of these bases for nondisclosure of the information at issue are entirely justified under the law.

I.      USTR Properly Withheld National Security Information That is
        Classified in Accordance With Executive Order 12,958, as Amended

USTR has withheld from plaintiffs the records in Groups 1, 3, 5, 7, 8, and 9 in full, and in Groups 2 and 6 in part, pursuant to Exemption 1 of the FOIA.[4]  Exemption 1 of the FOIA protects from disclosure information which is "(A) specifically authorized under criteria established by an executive order to be kept secret in the interest of national defense or foreign policy and (B) [is] in fact properly classified pursuant to such executive order."  5 U.S.C. § 552(b)(1).  This exemption protects national security information that has been properly classified pursuant to the substantive and procedural criteria contained in the relevant executive order.  See Exec. Order No. 13,292, 68 Fed. Reg. 15,315 (Mar. 28, 2003) [hereinafter E.O. 12,958, as amended], reprinted in 50 U.S.C. § 435 note (2006).  Thus, the courts have prescribed a two-fold test to be applied in order to determine whether material has been properly withheld under Exemption 1: (1) procedurally, the agency must demonstrate that it followed the proper procedures in classifying the information and, (2) substantively, the agency must show that the records at issue logically fall within the exemption.  See Salisbury v. United States, 690 F.2d 966, 970-72 (D.C. Cir. 1982); Military Audit Project v. Casey, 656 F.2d 724, 737 (D.C. Cir.

---

[4] As discussed below, the documents in Groups 2, 3, 6, 8, and 9 are also being withheld, in full or in part, pursuant to Exemption 5 of the FOIA, and the documents in Group 8 are further protected by Exemption 3 of the FOIA.

-11-

1981); Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv., 608 F.2d 1381, 1387 (D.C. Cir. 1979);

Schoenman v. FBI, 575 F. Supp. 2d 136, 151-152 (D.D.C. 2008) (holding that agencies asserting

Exemption 1 are required to "show both that the information was classified pursuant to the

proper procedures, and that the withheld information substantively falls within the scope of [the

applicable] Executive Order").  As is discussed in more detail below, because USTR has met the

relevant classification standards, both the procedural and substantive elements of Exemption 1

have been satisfied in this case.

      A.    USTR Followed Proper Procedures in
              Classifying the Information

The declarations of Mr. Maruyama and Mr. McCoy describe the process of determining

whether the USTR records at issue are properly classified pursuant to E.O. 12,958, as amended,

and whether the records were marked appropriately.  (See Maruyama Decl. ¶¶ 5, 10; McCoy

Decl. ¶¶ 32-46.)  In addition, the declaration of Mr. McCoy describes his supplemental review of

the classified records which had been withheld from plaintiffs pursuant to Exemption 1 of the

FOIA, in accordance with USTR's January 30, 2009 agreement with plaintiffs to consider

whether Attorney General Holder's March 19, 2009 FOIA Guidelines called for USTR to release

any additional records in response to plaintiffs' request.  (See McCoy Decl. ¶¶ 39-46.)

As an initial matter, in order for records to be properly classified, they must be classified

by an original classification authority.  See E.O. 12,958, as amended, section 1.1(a).  All of the

records were classified pursuant to Mr. Maruyama's February 8, 2008 memorandum which, based

on a confidentiality agreement between the United States and its negotiating partners, directed

that all documents exchanged in the course of the ACTA negotiations were to be classified as

"Confidential Foreign Government Information" pursuant to E.O. 12,958, as amended.  (See

-12-

Maruyama Decl. ¶ 4 & Attachs. A, B.)  As a designated original classification and declassification authority within USTR, Mr. Maruyama was qualified to review, classify or declassify information.[5]  (See id. ¶ 1.)  In addition to having original classifying authority, as General Counsel of USTR Mr. Maruyama was only one level below the United States Trade Representative, and was the designated "senior agency official" authorized by the Executive Order to classify or reclassify records once they are subject to a FOIA request.  See E.O. 12,958, as amended, section 1.7(d); id. ¶ 10.  Finally, Mr. McCoy, too, is a designated original classification and declassification authority qualified to review, classify or declassify information within USTR.  (See McCoy Decl. ¶ 1.)  Mr. Maruyama and Mr. McCoy reviewed, on a page-by-page basis, all of the classified records withheld from plaintiffs pursuant to Exemption 1 of the FOIA and have determined that they are properly classified in accordance with Mr. Maruyama's February 8, 2008 memorandum ordering classification of all ACTA negotiation documents as "Confidential Foreign Government Information."  (See Maruyama Decl. ¶ 10; McCoy Decl. ¶¶ 32-46.)

Moreover, the Executive Order requires that classified information must be owned by, produced by or for, and under the control of the United States Government.  See E.O. 12,958, as amended, section 1.1(a).  Mr. Maruyama and Mr. McCoy personally determined that the documents at issue are all USTR negotiation documents falling within this requirement.  (See Maruyama Decl. ¶ 5; McCoy Decl. ¶¶ 32-46.)  Furthermore, in order to satisfy the procedural requirements of Exemption 1 of the FOIA, the withheld information must fall within one of the

---

[5] As noted above, Mr. Maruyama is no longer with USTR but was the agency's General Counsel at the time his declaration was executed.

-13-

categories of information listed in section 1.4 of the Executive Order. <u>See</u> E.O. 12,958, as amended, section 1.1(a). In this case, Mr. Maruyama and Mr. McCoy personally determined that the records contain foreign government information. (<u>See</u> Maruyama Decl. ¶¶ 3, 5, 10; McCoy Decl. ¶¶ 32-46.) An original classification authority must also determine that the disclosure of the information reasonably could be expected to result in damage to national security at one of the three levels outlined in the order. <u>See</u> E.O. 12,958, as amended, 1.1(a). Mr. Maruyama's and Mr. McCoy's reviews carefully considered the impact that disclosure of the records at issue would have on the foreign relations and economic security of the United States, and determined that the disclosure of the information that remained classified at the end of their review, all of which is marked as "Confidential," could reasonably be expected to cause damage to national security. (<u>See</u> Maruyama Decl. ¶¶ 8, 9; McCoy ¶¶ 32-46.)

Mr. Maruyama and Mr. McCoy confirm that, pursuant to sections 1.6 and 1.7 of E.O. 12,958, as amended, each document containing classified information was, appropriately marked, originally by USTR negotiators or by Mr. Maruyama himself, with the proper classification markings at the "Confidential" level. (<u>See</u> Maruyama Decl. ¶ 5; McCoy ¶¶ 32-46.) Finally, Mr. Maruyama and Mr. McCoy also confirmed that any reasonably segregable portions of the records at issue that did not meet the standards for classification were declassified and marked for release. (<u>See</u> Maruyama Decl. ¶ 9; McCoy Decl. ¶¶ 32-46.) In fact, as Mr. Maruyama notes, USTR obtained the consent of participating governments to release certain ACTA documents containing their information, such as agendas and the confidentiality agreement itself, and those documents were released to plaintiffs. (<u>See</u> Maruyama Decl. ¶ 9.) Additionally, Mr. McCoy re-reviewed all of the classified records in order to assess whether any of the information was

-14-

appropriate for declassification and release in light of Attorney General Holder's March 19, 2009

FOIA guidelines, and he determined that certain classified pages could be declassified and

released as a matter of agency discretion, and this material was then disclosed to plaintiffs.[6]  (See

McCoy Decl. ¶¶ 32-46.)  The remaining foreign government information is not appropriate for

declassification inasmuch as disclosure could reasonably be expected to damage national

security.  (See Maruyama ¶¶ 8, 9; id. ¶¶ 32-46.)

The declarations of Mr. Maruyama and Mr. McCoy make clear that USTR fully

conformed to the procedural requirements of E.O. 12,958, as amended, in this case.

> B.    The Withheld Information Meets the Substantive Requirements of
>        Exemption 1

Having satisfied the procedural requirements of the Executive Order, Mr. Maruyama and

Mr. McCoy also ensured that all of the classified information withheld from plaintiffs meets the

relevant substantive requirement for classification and protection under E.O. 12,958, as amended.

As noted above, and in accordance with section 1.4 of E.O. 12,958, as amended, USTR withheld

classified "foreign government information" from plaintiffs pursuant to Exemption 1.  (See

Maruyama Decl. ¶¶ 3, 5, 10; McCoy Decl. ¶¶ 28-31, 48.)   "Foreign government information" is

defined by the Executive Order as follows:[7]

> information provided to the United States Government by a foreign government . . .
> with the expectation that the information . . . [is] to be held in confidence; [or]

---

[6] In addition to these disclosures, on April 6, 2009 USTR and its negotiating partners
released an ACTA summary which represents the most comprehensive joint effort to date of all
of the participants in the negotiation to provide information on the ACTA to the public.  (See
McCoy Decl. ¶ 44.)

[7] E.O. 12,958, as amended, also states that "[t]he unauthorized disclosure of foreign
government information is presumed to cause damage to the national security."  See E.O. 12,958,
as amended, 1.1(c).

-15-

> information produced by the United States Government pursuant to or as a result of
> a joint arrangement . . . requiring that the information . . . be held in confidence.

See E.O. 12,958, as amended, 6.1(r).  Specifically, the foreign government information USTR

has withheld from plaintiffs consists of:  ACTA negotiation documents, including draft and final

negotiating proposals and documents in support of such proposals, associated e-mail messages

that USTR negotiators and attorneys received from or transmitted to officials, including foreign

government officials, in the course of planning for and carrying out the ACTA negotiations, and

portions of inter-agency communications and communications between USTR personnel and

members of a federally chartered private sector advisory committee on trade-related intellectual

property rights, ITAC-15, which contain such information.  (See Maruyama Decl. ¶ 3; McCoy

Decl. ¶¶ 32-46 & Attach. E.)

   For the reasons set forth below, USTR respectfully suggests that it has fully satisfied the

substantive requirements of Exemption 1 of the FOIA, inasmuch as the declarations of Mr.

Maruyama and Mr. McCoy demonstrate that release of the classified information at issue would

constitute an unwarranted risk to the national security of the United States.  See Morley v. CIA,

508 F.3d 1108, 1124 (D.C Cir. 2007) (noting that "the text of Exemption 1 itself suggests that

little proof or explanation is required beyond a plausible assertion that information is properly

classified"); Miller v. DOJ, 562 F. Supp. 2d 82, 101 (D.D.C. 2008) (finding that de novo review

is required even when national security matters are at issue, but noting that courts "generally

defer to agency expertise in national security matters"); Summers v. DOJ, 517 F. Supp. 2d 231,

238 (D.D.C. 2007) (deferring to agency expertise in national security, noting that assessing

potential for harm to intelligence source from disclosure "is the duty of the agency, and not the

-16-

court," and finding that an agency's justification for invoking Exemption 1 is sufficient if it "appears logical or plausible" (citing <u>Wolf v. CIA</u>, 473 F.3d 370, 374-75 (D.C. Cir. 2007))).

Before engaging in a formal exchange of proposals, the United States and the other governments participating in the ACTA negotiations agreed that "documents relating to the proposed [ACTA] will be held in confidence." (<u>See</u> Maruyama Decl. ¶ 4 & Attach. A; McCoy Decl. ¶¶ 32-46.) This confidentiality agreement was designed to enable officials of participating governments to engage in frank exchanges of views, positions, and specific negotiating proposals, and to facilitate the resolution of disparate national interests and perspectives to lay the groundwork for an eventual agreement. (<u>See</u> Maruyama Decl. ¶ 6; McCoy Decl. ¶¶ 32-46.) In recognition of the importance of maintaining the confidentiality of trade negotiations, USTR frequently agrees in writing with its partners in major trade negotiations, such as the ACTA, to keep negotiating records confidential. (<u>See</u> McCoy Decl. ¶¶ 32-46.) The ACTA partners' confidentiality agreement, and Mr. Maruyama's February 8, 2008 corresponding classification order, unambiguously encompass all of the classified information that USTR has withheld pursuant to Exemption 1 of the FOIA. (<u>See</u> Maruyama Decl. ¶ 5; <u>id.</u> ¶¶ 32-46.) A unilateral release of this information by the United States would constitute a breach of that agreement. (<u>See</u> Maruyama Decl. ¶¶ 5, 9.) In light of the confidentiality agreement, and consistent with the confidential nature of trade negotiations, including ACTA negotiations, it is plain that all of the withheld information was either (1) provided to USTR by foreign governments "with the expectation that the information . . . [was] to be held in confidence," or (2) produced by USTR and circulated with other Executive Branch agencies and with the ITAC-15 in connection with

-17-

the ACTA negotiations pursuant to a "joint arrangement" requiring that such information "be

held in confidence." See E.O. 12,958, as amended, 6.19(r).

     If the United States unilaterally discloses to the public documents that it and other

participants have exchanged in confidence with regard to the ACTA negotiations, it will

discourage further such exchanges, undermine trust in USTR's ACTA negotiators, and make it

difficult or impossible to conclude an agreement on favorable terms to the United States, because

negotiating partners would be more likely to adopt and maintain rigid negotiating positions

unfavorable to United States economic interests.  (See Maruyama Decl. ¶¶ 7, 8.)  As Mr.

Maruyama explains, foreign governments are typically willing to engage in the give-and-take of

negotiations with the United States necessary to conclude trade agreements only if they can rely

on assurances from the United States that negotiating texts and related documents and

communications exchanged with its negotiating partners will be protected from unilateral public

disclosure.  (See id.)

     In the event that the United States were to breach its confidentiality agreement with its

negotiating partners, the loss of trust that such a breach would generate would have substantial

consequences not only for the ongoing ACTA negotiations -- impeding United States efforts to

address the harms associated with piracy and counterfeiting -- but would have long ranging

consequences affecting United States credibility as a negotiating partner for future trade

negotiations.  (See Maruyama Decl. ¶ 8; McCoy Decl. ¶¶ 32-46.)  The potential harm associated

with breaching the ACTA confidentiality agreement makes it fully appropriate for USTR to

withhold the records encompassed by that agreement.  See Miller, 562 F. Supp. 2d at 103

(allowing withholding of foreign government information when disclosure could be expected to

-18-

chill relationship between U.S. and foreign officials and make them less likely to cooperate in the

future).  Mr. McCoy explains:

> Of paramount importance to a successful negotiation is an environment in which
> negotiating partners can exchange ideas, draft texts, draft comments on texts, and
> other negotiating documents with the understanding that these exchanges will be held
> in confidence.  When negotiating partners function in an environment of confidence,
> they are freer to engage in the give-and-take that is necessary to reach a successful
> conclusion [to negotiations] . . . .
>
> [If that confidential information is released] foreign governments would be
> reluctant to entrust the handling of [their] information to the discretion of the
> United States and it would be reasonably expected to strain relations between
> the United States and the foreign governments, and lead to diplomatic,
> political, or economic repercussions.

(See McCoy Decl. ¶¶ 13-14.)

A unilateral disclosure by the United States of records reflecting its exchanges with its

ACTA negotiating partners would amount to an unequivocal breach of the reciprocal

confidentiality arrangements that the United States agreed would govern the negotiations.  (See

Maruyama Decl. ¶ 7; id..)  Given the effects such a disclosure would have on the ACTA

negotiations, on the credibility of the United States in other negotiations, and on the economic and

political interests of the United States, Mr. Maruyama and Mr. McCoy have appropriately

determined that release of the information at issue could reasonably be expected to damage the

national security of the United States, and that all of the withheld information therefore continues

to warrant classification at the "Confidential" level and protection under Exemption 1 of the

FOIA.  (See Maruyama Decl. ¶¶ 5, 8, 9; McCoy ¶¶ 32-46.)

It is well established that requiring an agency to release information exchanged with a

foreign government in confidence would undermine future attempts by the United States to

exchange similar information in the future, and that the FOIA allows the withholding of such

-19-

information.  See, e.g., Southam News v. INS, 674 F. Supp. 881, 885 (D.D.C. 1987); Republic of New Afrika v. FBI, 656 F. Supp. 7, 13 (D.D.C. 1985); Shaw v. United States Dep't of State, 559 F. Supp. 1053, 1063 (D.D.C. 1983); see also Am. Jewish Congress v. Dep't of the Treasury, 549 F. Supp. 1270, 1277 (D.D.C. 1982), aff'd, 713 F.2d 864 (D.C. Cir.).  Mr. Maruyama and Mr. McCoy's assessment that disclosure of foreign government information would jeopardize the national security of the United States makes clear that this information is appropriately withheld under Exemption 1 of the FOIA.

As noted above, Mr. Maruyama and Mr. McCoy personally examined all of the classified foreign government information withheld from plaintiffs pursuant to Exemption 1 of the FOIA to determine if any information could be segregated for release to plaintiffs and, when possible, USTR made such disclosures.  (See Maruyama Decl. ¶ 8, 9; McCoy Decl. ¶¶ 32-46.)   Only when it was determined that the disclosure of this information could reasonably be expected to cause damage to national security was information withheld.  (See McCoy Decl. ¶¶ 32-46.)

Because USTR followed the proper procedures and substantive elements of E.O. 12,958, as amended, for classifying the information at issue here, and because relevant case law well supports its applications of Exemption 1, USTR respectfully submits that its use of Exemption 1 of the FOIA to withhold foreign government information was appropriate.  See Elec. Privacy Info. Ctr. v. DOJ, 584 F. Supp. 2d 65, 71 (D.D.C. 2008) (finding that "it is well-established that the judiciary owes some measure of deference to the executive in cases implicating national security" (quoting Ctr. for Nat'l Sec. Studies v. DOJ, 331 F.3d 918, 926-27 (D.C. Cir. 2003)), and determining that court "will not second-guess" agency's harm determination "so long as the

-20-

agency's declarations provide sufficient detail" to show that material fits "' within the domain of

the exemption claimed.'" (quoting Campbell v. DOJ, 164 F.3d 20, 30 (D.C. Cir. 1998))).

II.     USTR Properly Withheld Information Related Solely to the
        Internal Personnel Rules and Practices of the Agency
        Pursuant to Exemption 2 of the FOIA

USTR has withheld certain contact information from plaintiff in the records at issue

pursuant to Exemption 2 of the FOIA.  Exemption 2 exempts from mandatory disclosure material

"related solely to the internal personnel rules and practices of an agency."  5 U.S.C. § 552(b)(2).

Information is deemed predominantly internal if it establishes "rules and practices for agency

personnel" and involves no "secret law" of the agency.  See Schiller v. NLRB, 964 F.2d 1205,

1207 (D.C. Cir. 1992).  The courts have interpreted Exemption 2 to encompass two distinct

categories of information:  (a) internal matters of a relatively trivial nature, sometimes referred to

as "low 2" information, see Department of the Air Force v. Rose, 425 U.S. 352, 369-70 (1976);

and, (b) more substantial internal matters the disclosure of which would risk circumvention of a

legal requirement, sometimes referred to as "high 2" information, see Crooker v. ATF, 670 F.2d

1051, 1074 (D.C. Cir. 1981).

In this case, USTR withheld the e-mail addresses and direct telephone numbers (including

telephone "participant codes") of USTR employees pursuant to Exemption 2 of the FOIA.  (See

McCoy Decl. ¶¶ 47-48 & Attach. E.)  This information is protected from disclosure pursuant to

the "high 2" category of Exemption 2.  Outlining the standards for withholding information under

"high 2," the United States Court of Appeals for the District of Columbia Circuit in Crooker held

that information must be "predominantly internal" and, if disclosed, could be expected to

-21-

"significantly risk[] circumvention of agency regulations or statutes" to be properly protected.

Crooker, 670 F.2d at 1074.

        A.     E-mail Addresses

As Mr. McCoy explains, USTR is part of the Executive Office of the President (EOP) and its e-mail services are managed together with all other offices under the EOP, including the White House. (See McCoy Decl. ¶¶ 47-48.) Because all EOP offices use the same e-mail format, the release of e-mail addresses of USTR employees would not only subject USTR employees to a barrage of unsolicited e-mails, but would also reveal how one could send e-mails to any employees within the EOP, including White House employees, based only on knowing an employee's name. (See id.)

        B.     Telephone Numbers

It is well established that sensitive telephone numbers and related contact information are purely internal information which is properly withheld pursuant to Exemption 2 of the FOIA. See, e.g., Hale v. DOJ, 973 F.2d 894, 902 (10th Cir. 1992) (FBI room numbers, telephone numbers, and FBI employees' identification numbers; personnel directories containing names and addresses of FBI employees); Concepcion v. FBI, No. 07-1766, 2009 WL 794484, at *9-10 (D.D.C. Mar. 27, 2009) (telephone numbers of FBI employees, Assistant U.S. Attorneys and paralegals); James Madison Project v. CIA, No. 07-1382, 2009 WL 780228, at *9-10 (D.D.C. Mar. 26, 2009) (telephone and fax numbers of CIA employees); Durrani v. DOJ, No. 08-0609, 2009 WL 755219, at *9 (D.D.C. Mar. 24, 2009) (direct telephone numbers of Immigration and Customs Enforcement agents); Coleman v. Lappin, No. 06-2255, 2009 WL 692161, at *3 (D.D.C. Mar. 18, 2009) (phone and fax numbers for BOP personnel); Kishore v. DOJ, 575 F. Supp. 2d

-22-

243, 255 (D.D.C. 2008) (internal FBI telephone and facsimile numbers); Singh v. FBI, 574

F. Supp. 2d 32, 44 (D.D.C. 2008) (DEA telephone numbers); Odle v. DOJ, No. 05-2711, 2006

WL 1344813, at *13 (N.D. Cal. May 17, 2006) ("non-public [OPR] fax numbers and telephone

numbers").

    If the information USTR has withheld pursuant to Exemption 2 of the FOIA were

released, the EOP's computer and phone systems could be overwhelmed or EOP staff could be

subject to excessive harassment, thus preventing USTR and, by extension, any other EOP office

or even the White House from conducting essential business.[8]  (See McCoy Decl.¶¶ 47-48.)  It is

especially appropriate to withhold agency contact information when, as with EOP employees,

agency officials are uniquely susceptible to harassment.  See, e.g., Antonelli v. BOP, 569 F. Supp.

2d 61, 65 (D.D.C. 2008) (allowing withholding of ICE employee telephone numbers because

harassing telephone calls would inhibit ICE's ability to carry out responsibilities); Truesdale v.

DOJ, No. 03-1332, 2005 WL 3294004, at *5 (D.D.C. Dec. 5, 2005) (protecting FBI Special

Agents' telephone and facsimile numbers, because disclosure "would disrupt official business and

could subject the FBI's employees to harassing telephone calls").

    Accordingly, USTR respectfully submits that it properly protected purely internal contact

information, inasmuch as disclosure of this information could impede the effectiveness of USTR

and EOP operations.

---

[8] It should be noted that USTR only protected the direct telephone lines and individual e-mail addresses of its employees.  (See McCoy Decl.¶ __ & Attach. E.)  USTR's general office telephone numbers and e-mail addresses are publicly available on its website at www.ustr.gov.

-23-

III.    USTR Properly Withheld Information
        Pursuant to Exemption 3 of the FOIA

USTR has withheld from plaintiffs the records in Group 8 pursuant to Exemption 3 of the

FOIA.[9]  Exemption 3 allows the withholding of information prohibited from disclosure by another

federal statute if one of two disjunctive requirements are met:  the statute either "(A) requires that

the matters be withheld from the public in such a manner as to leave no discretion on the issue, or

(B) establishes particular criteria for withholding or refers to particular types of matters to be

withheld."  5 U.S.C. § 552(b)(3) (emphasis added).  Courts have held that a statute falls within the

exemption's coverage if it satisfies either of these requirements.  See Long v. IRS, 742 F.2d 1173,

1178 (9th Cir. 1984); Irons & Sears v. Dann, 606 F.2d 1215, 1220 (D.C. Cir. 1979); Am. Jewish

Cong. v. Kreps, 574 F.2d 624, 628 (D.C. Cir. 1978).  Once it is established that a statute is the

type of nondisclosure statute encompassed by Exemption 3, an agency next must establish that the

records in question fall within the withholding provision of the statute.  See, e.g., CIA v. Sims,

471 U.S. 159, 167 (1985) (requiring that, to constitute proper withholding under Exemption 3, the

statute must qualify as a nondisclosure statute by meeting requirements of subpart (A) or subpart

(B) and records in question must fall within statute's scope).

In the instant case, USTR has withheld information from plaintiffs pursuant to a provision

of the Trade Act of 1974, 19 U.S.C. § 2155(g), which provides that information which is

submitted in confidence to the government by certain private sector advisors, may be disclosed

upon request to specified government officials and other advisory committees in connection with

limited matters referred to in the statute.  See 19 U.S.C. § 2155(g); McCoy Decl. ¶¶ 49-50.

---

[9] As discussed above, the documents in Group 8 have also been withheld in part pursuant to Exemption 1 of the FOIA and, as discussed below, pursuant to Exemption 5 of the FOIA.

-24-

Specifically, USTR has withheld under Exemption 3 of the FOIA, in conjunction with this statutory provision, comments on draft negotiating texts of the ACTA which it received from private sector advisors pursuant to a consultative mechanism required by the statute but which have not been "requested" by the specified officials to whom disclosure is permitted under the statute.  (McCoy Decl. ¶¶ 49-50 & Attach. E.)

The Trade Act of 1974 directs the President to establish "such sectoral or functional advisory committees as may be appropriate" and which are representative of "all industry, labor, agricultural, or service interests."  See 19 U.S.C. § 2155(c)(2).  The Trade Act of 1974 further directs that these Presidential advisory committees meet upon request of the United States Trade Representative and provide "policy advice, technical advice and information, and advice on other factors."  See 19 U.S.C. § 2155(d).  In accordance with the Trade Act of 1974, the President has established a comprehensive Industry Trade Advisory Committee (ITAC) system, which includes committees devoted to specific trade-related areas.  (See McCoy Decl. ¶¶ 49-50.)  The members of advisory committees receive security clearances from the government and are referred to as "cleared advisors."  (See id.)  To solicit views from cleared advisors, USTR posts documents on a secure website, and individual cleared advisors then access the documents and provide comments directly to individual USTR officials.  (See id.)  Cleared advisors' comments may range from technical comments on wording choices in draft negotiating texts to comments on overall intellectual property international trade policy.  (See id.)  The Industry Trade Advisory Committee 15 (ITAC-15) is focused on intellectual property rights and its members include representatives from the software, recording, movie, and publishing industries, as well as the Global Health Council.  (See id.)

-25-

As Mr. McCoy explains, USTR has implemented, and the ITAC-15 cleared advisors have participated in, this advisory system with an understanding that communications exchanged would be held in confidence. (See id. ¶¶ 49-50.) This understanding is based on the statute which, as noted above, specifies that the information or advice from cleared advisors may be disclosed to certain government officials, certain Congressional officials, and the advisory committees themselves. (See id.) Public disclosure, such as would occur in response to a FOIA request, is not contemplated by the statute. USTR's protection of these communications under the statute in connection with Exemption 3 is supported by the legislative history. Indeed, USTR specifically recognizes that the confidentiality of the cleared advisor system is in keeping with the language of subsection (g) of the Trade Act of 1974, and with the statements of the Senate Finance Committee upon implementation of the statute, which included the following:

> The Committee is aware that this subparagraph would establish a limited statutory exemption to the Freedom of Information Act, as amended. It is the view of the Committee, however, that this exception is necessary due to the nature of the information involved and the adverse impact which such information could have on the ability of the United States effectively to carry out the multilateral trade negotiations.

See Senate Report No. 93-1298, reprinted in 93 U.S.C.C.A.N. 7186, 7251; McCoy Decl. ¶ 13.

In considering whether information is properly withheld under Exemption 3, Courts first look to the language of the statute, see, e.g., Reporters Comm. for Freedom of the Press v. DOJ, 816 F.2d 730, 735 (D.C. Cir. 1987), modified on other grounds, 831 F.2d 1124 (D.C. Cir. 1987), rev'd on other grounds, 489 U.S. 749 (1989); see also Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n, 533 F.3d 810, 813-14 (D.C. Cir. 2008), but may also look beyond the face of the statute in considering whether Congress intended to exempt information from disclosure. See Sims v. CIA, 471 U.S. 159, 170 (1985) (noting congressional intent in the National Security Act of 1947 to

-26-

"give the Director of Central Intelligence broad power to protect the secrecy and integrity of the intelligence process"); Wis. Project on Nuclear Arms Control v. U.S. Dep't of Commerce, 317 F.3d 275, 282-84 (D.C. Cir. 2003) (looking to legislative history of section 12(c) of Export Administration Act of 1979, 50 U.S.C. app. § 2411(c) (2006), and finding that section 12(c) qualified under Exemption 3 where Congress made plain its intent to prevent disclosure of export-application information).

The Trade Act of 1974 not only specifically limits the available channels for disclosure of information submitted under the advisory committee system, but in recognition of the need for U.S. negotiators to have access to this confidential information, Congress clearly anticipated that it would create an exemption to the FOIA. See Senate Report No. 93-1298, reprinted in 93 U.S.C.C.A.N. at 7251; McCoy Decl. ¶¶ 49-50. Moreover, there can be no question that the information USTR withheld -- confidential advice from cleared advisors of the ITAC-15 regarding draft negotiating texts USTR submitted through the secured advisor system pursuant to the requirements of 19 U.S.C. § 2155(c)(2), see McCoy Decl. ¶ 49 -- is precisely the information encompassed by the disclosure limitations of 19 U.S.C. § 2155(g).

Once an agency has established that the information at issue falls within the coverage of a nondisclosure statute, invocation of Exemption 3 is appropriate. See, e.g., Fitzgibbon v. CIA, 911 F.2d 755, 762 (D.C. Cir. 1990); Goland, 607 F.2d at 350; Nat'l Sec. Archive Fund, Inc. v. CIA, 402 F. Supp. 2d 211, 219-20 (D.D.C. 2005). Accordingly, defendant respectfully suggest that its withholding of the information described in Group 8 of its Vaughn Index pursuant to Exemption 3 of the FOIA is appropriate.

-27-

IV.    USTR Properly Withheld Information
Pursuant to Exemption 5 of the FOIA

USTR has withheld from plaintiffs the records in Groups 2,[10] 6, and 8 in full, and Groups

3, 4, and 9 in part, pursuant to Exemption 5 of the FOIA.[11]  Exemption 5 of the FOIA protects

from disclosure "inter-agency or intra-agency memorandums or letters that would not be available

by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).  This exemption

authorizes the withholding of documents "normally privileged in the civil discovery context."

NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975); see also Burka v. HHS, 87 F.3d 508,

516 (D.C. Cir. 1996).  As such, Exemption 5 encompasses records covered by the attorney-client

privilege, see, e.g., Sears, 421 U.S. at 154; Mead Data Central, Inc. v. U.S. Dep't of the Air Force,

566 F.2d 242, 253 (D.C. Cir. 1977), and the deliberative process privilege, see, e.g., Wolfe v.

HHS, 839 F.2d 768, 773 (D.C. Cir. 1988) (en banc).  With respect to the records in Groups 2, 3, 4,

6, 8, and 9 which have been withheld pursuant to Exemption 5, the records in Group 6 are

protected in full by the attorney-client privilege, and all of the records are protected, in full or in

part, by the deliberative process privilege.  (See Attach. E.)

A.    The Withheld Information Meets the Threshold
Test for Exemption 5

The records USTR has withheld pursuant to Exemption 5 of the FOIA fall into two broad

categories:  (1) communications exchanged between USTR and officials at the Department of

Commerce, the Department of Homeland Security, the Department of Justice, the Department of

---

[10] Twelve of the pages in Group 2 have only been protected in part pursuant to Exemption 5 of the FOIA.  (See McCoy Decl. Attach. E.)

[11] As discussed above, the documents in Groups 2, 3, 6, 8, and 9 have also been wiithheld, in full or in part, pursuant to Exemption 1 of the FOIA, and the documents in Group 8 are further protected by Exemption 3 of the FOIA..

-28-

State, the National Security Council, and the Library of Congress, and included in Groups 2, 3, 4, 8, and 9, of defendant's Vaughn Index; and (2) communications exchanged between USTR and cleared advisors of the ITAC-15,[12] and included in Group 6 of defendant's Vaughn Index.  (See McCoy Decl. ¶¶ 51-68 & Attach. E.)

The threshold issue under Exemption 5 is whether the records in question qualify as "inter-agency or intra-agency memorandums."  Records created by a government agency and circulated within that agency or between that agency and other agencies -- as were the inter-agency communications protected in Groups 2, 3, 4, 8, and 9 -- clearly meet the threshold requirement. See Ryan v. DOJ, 617 F.2d 781, 790 (D.C. Cir. 1980).  The communications with the ITAC-15 -- whose cleared advisors served as consultants to USTR -- contained in Group 6 of defendant's Vaughn Index, also fall within the threshold for protection under Exemption 5.  See Ryan at 790 (protecting records involving members of the Senate whom DOJ consulted with on judicial nominations and finding it "entirely reasonable" that a record submitted by an outside consultant may fall within Exemption 5's threshold.)  The Court of Appeals for the District of Columbia has held that "inter-agency or intra-agency" are not meant to be "rigidly exclusive terms," and that agencies often need "to rely on the opinions and recommendations of temporary consultants" who are "an integral part of [the agency's] deliberative process."  See Dow Jones & Co. v. DOJ, 917 F.2d 571, 574-75 (D.C. Cir. 1990) (quoting Ryan, 617 F.2d at 789); see also Public Citizen, Inc. v. DOJ, 111 F.3d 168 (D.C. Cir. 1997) (upholding application of Exemption 5 to communications

---

[12] The ITAC-15 and the advisory committee system is described in more detail in the Exemption 3 discussion, above.

-29-

between a former President and the National Archives and Records Administration regarding

consultations under the Presidential Records Act).

Both the Supreme Court and the Court of Appeals for the District of Columbia Circuit

have approved this principal (commonly referred to as the "consultant corollary to Exemption 5")

and, in particular, have recognized that the President must be able to inform his decisionmaking

by obtaining reliable and informed advice from experts in confidence.  In EPA v. Mink, for

instance, the Supreme Court deemed it "beyond question that [agency documents prepared for a

presidentially created committee organized to advise him on matters involving underground

nuclear testing] are 'inter-agency or intra-agency' memoranda or 'letters' that were used in the

decisionmaking processes of the Executive Branch."  410 U.S. 73, 85 (1973).  More recently, in

Judicial Watch, Inc. v. DOE, the Court of Appeals for the District of Columbia Circuit considered

the withholding of agency records under the deliberative process privilege of Exemption 5,

related to the National Energy Policy Development Group (NEPDG), which former President

George W. Bush established for the purpose of developing a "national energy policy designed to

help the private sector, and government at all levels, promote dependable, affordable, and

environmentally sound production and distribution of energy for the future."  412 F.3d 125, 127

(D.C. Cir. 2005).  In upholding the agency's protection of NEPDG deliberations under Exemption

5, the Court acknowledged that the records at issue were not typically "inter-agency" but that the

President and his White House advisors "surely must be briefed fully and frequently" on

policymaking matters.  Id. at 130.  Significantly, the Court first recognized that records submitted

by outside consultants upon solicitation by agencies, as part of the deliberative process, are

encompassed by Exemption 5, and then found that to compel disclosure of documents shared with

-30-

or received from "a body established by the President solely to advise him, would be anomalous

indeed" with that precedent.  Id. at 130-131.  This ruling echoed the Supreme Court's finding in

EPA v. Mink that, where an advisory body was created specifically to advise the President on

policy issues, it would be "inconceivable" for Congress to have intended for Exemption 5 to apply

to decisionmaking processes where the decisionmaker was an agency official subject to

presidential oversight but not to decisionmaking processes where the decisionmaker is the

President himself.  410 U.S. at 130.

It is likewise inconceivable that Congress would have required the President to seek

advice from the private sector in order to inform his decisionmaking, and to share government

information in doing so, with the intent that such consultations would be disclosed under the

FOIA.  In fact, the legislative record demonstrates that Congress considered this very scenario

with respect to the Trade Act of 1974, 19 U.S.C. § 2155, recognizing in the statute itself the need

for confidentiality in advisory committee consultations, and explicitly recognizing that these

confidential communications should not be disclosed under the FOIA.  In the words of the Senate

Committee on Finance:

> The Committee is aware that [the subparagraph limiting disclosure of advice
> submitted in confidence by the private sector] would establish a limited statutory
> exemption to the Freedom of Information Act, as amended.  It is the view of the
> Committee, however, that this exception is necessary due to the nature of the
> information involved and the adverse impact which such information could have on
> the ability of the United States effectively to carry out the multilateral trade
> negotiations.

Senate Report No. 93-1298, reprinted in 93 U.S.C.C.A.N. at 7251; McCoy Decl. ¶¶ 51-68.

The "consultant corollary" to Exemption 5 was considered by the Supreme Court in

Department of Interior v. Klamath Water Users Protective Association, 532 U.S. 1, 11 (2001).  In

-31-

Klamath, the Court implicitly recognized that communications with outside consultants may be deemed part of an agency's deliberative process where those communications "played essentially the same part in the agency's process of deliberation as documents prepared by agency personnel might have done," id. at 10, but held that Exemption 5 did not encompass communications between the Department of the Interior and several Indian tribes that, in making their views known to the agency on certain matters of administrative decisionmaking, had "their own, albeit entirely legitimate, interests in mind." Id. at 3.  In so ruling, the Court emphasized the fact that the Indian tribes were "seeking a Government benefit at the expense of other applicants." Id. at 12 & n.4.  Thus, the Court concluded that the Indian tribes, who were communicating with the government as "self-advocates" for water rights at the expense of other applicants who were seeking those same benefits, failed to qualify as government consultants and, therefore, failed to satisfy Exemption 5's "intra-agency" or "inter-agency" requirement. Id. at 12.  As such, records submitted to the agency by the tribes as "outside consultants" did not qualify for deliberative process privilege protection. Id. at 16.

There are two fundamental and telling distinctions between the facts in Klamath and those relating to the communications between USTR and the cleared advisors of the ITAC-15 in the instant case.  First, unlike in Klamath, the ITAC-15 members are not competing for a government benefit in their communications with USTR.  The ITAC-15's discussions with USTR are in furtherance of ongoing trade negotiations between the Government of the United States and the Governments of Australia, Canada, the European Union and its Member States, Japan, Korea, Mexico, Morocco, New Zealand, Singapore, and Switzerland.  (See McCoy Decl. ¶¶ 51-68.)  In Klamath, Indian tribes sent information to the government agency in an effort to obtain a

-32-

government benefit -- water resources -- to the detriment of other parties who were also

petitioning the government for the same benefit.  532 U.S. at 13.  Collaborating with the Office of

the United States Trade Representative in its pursuit of an international trade agreement to combat

global piracy and counterfeiting does not involve "seeking a government benefit at the expense of

others."  Id. at 12 & n.4.  Second, unlike the Indian tribes in Klamath, the ITAC-15 is not simply

"self-advocating" on a matter of agency decisionmaking.  Rather, the cleared advisors of the

ITAC-15 are acting, by statute, as advisors to USTR in representation of the very domestic trade

interests that negotiations of this nature are meant to promote.  As Mr. McCoy explains:

> USTR also consults with [ITAC-15] advisors, as required by statute.  The President
> is required to seek information and advice from representative elements of the private
> sector with respect to, among other things, the development, implementation, and
> administration of U.S. trade policy, including from advisory committees.

(See McCoy Decl. ¶¶ 51-68.)  In implementing the Trade Act of 1974, Congress explicitly

recognized that the President must be able to "consult closely" with those affected most by trade

negotiations:  the private sector of the U.S. economy.  Senate Report No. 93-1298, reprinted in

1974 U.S.C.C.A.N. 7186, 7251.  In turn, U.S. negotiators must obtain "vital information" to

inform their negotiations, or risk the success of their negotiations and even the future of the U.S.

trade negotiation program.  See id.  The U.S. Trade Representative is the President's principal

trade advisor and negotiator, and thus it is USTR which oversees international trade negotiations

on behalf of the President, forming issues for Presidential decisionmaking, see __, and it is USTR

negotiators who engage in the advisory committee consultations Congress required of the

President.  (See McCoy Decl. ¶¶ 51-68.)  Mr. McCoy, not only USTR's chief policy advisor on

intellectual property and trade issues, but an experienced negotiator himself, see McCoy Decl. ¶¶

-33-

1-3, explains the critical nature of the advice USTR receives from the intellectual property

advisory group, the ITAC-15:[13]

> Intellectual property is a highly technical and complex area of the law and an
> important part of the U.S. trade agenda.  The ITAC-15 provides valuable information
> and technical expertise that allows USTR to more effectively address intellectual
> property concerns around the world.

(See id. ¶¶ 51-68.)  In its communications with USTR, the ITAC-15 is not angling for an

exhaustible government resource but, quite to the contrary, it is providing much-needed

"policy advice, technical advice and information, and advice on other factors," see 19

U.S.C. § 2155(c)(2), to the President's trade negotiating arm, USTR, in development of

the United States' position on the ACTA negotiations.

In a particularly instructive case, the United States District Court for the District

of Columbia, in Public Citizen, Inc. v. Dep't of Justice, considered a provision of the

Presidential Records Act which requires the Archivist of the United States to consult with

a former President on certain Presidential records and upheld the application of

Exemption 5 of the FOIA to communications extending beyond the Executive Branch,

where the need for such consultations is "not only explicit . . . but is mandated by statute."

111 F.3d at 170.  The Court found that consultations under the Presidential Records Act

are precisely the type of communications that Exemption 5 was designed to protect

because, if an agency is to effectively deliberate, it should be able "enlist the help of

[skilled] outside experts."  Id. at 171.  USTR's communications with the ITAC-15 cleared

advisors fall squarely within the Court's analysis and, here too, the agency should be able

---

[13] As stated above, advisors of the ITAC-15 include representatives from the software,
recording, movie, and publishing industries, as well as the Global Health Council, all of whom
receive security clearances from the government.  (See McCoy Decl. ¶¶ 49-50.)

-34-

to enlist the expertise of these industry representatives -- as they are mandated to do by

statute -- to effectively negotiate on behalf of United States interests.[14]  (See McCoy Decl.

¶¶ 51-68.)

For the foregoing reasons, the cleared advisors are acting "as agency personnel

would have done," see Klamath, 532 U.S. at 10, and defendant therefore respectfully

suggests that all of the withheld records in Groups 2, 3, 4, 6, 8, and 9 of its Vaughn Index

meet the threshold requirement of Exemption 5 of the FOIA.

> B.     USTR Properly Invoked the Attorney-Client and
>        Deliberative Process Privileges

Once the threshold requirement has been met, the inquiry turns to the application

of the appropriate discovery privileges by an agency withholding the records.  In this

case, USTR withheld the records in Groups 2, 6, and 8 in full and in Groups 3, 4, and 9 in

part pursuant to two of the discovery privileges incorporated by Exemption 5:  the

attorney-client privilege and the deliberative process privilege.  (See Attach. E.)

Specifically, the records in Group 6 were withheld in full under the attorney-client

privilege,[15] and the records in Groups 2, 3, 4, 6, 8, and 9 were withheld in full or in part

pursuant to the deliberative process privilege.  (See id.)

---

[14] It is important to note that the fact that the ITAC-15 members are expressing their views on the ACTA does not mean that they are self-advocates in violation of Klamath.  In a recent decision, the United States Court of Appeals for the Tenth Circuit recognized that even consultants with "deep-seated views" on the subject in question can meet the Exemption 5 threshold.  See Stewart v. U.S. Dep't of the Interior, 554 F.3d 1236, 1245 (10th Cir. 2009); see also Public Citizen, 111 F.3d at 171 (holding that the existence of independent interests does not preclude withholding an outside consultant's communications under Exemption 5).

[15] The records in Group 6 which were withheld in full under the attorney-client privilige were also withheld, in part, under the deliberative process privilege.

-35-

The courts have interpreted Exemption 5 as covering all records that would normally be privileged in civil discovery, see, e.g., Sears, 421 U.S. at 149, including those covered by the deliberative process privilege, see, e.g., Wolfe, 839 F.2d at 773, and the attorney-client privilege, see, e.g., Sears, 421 U.S. at 154.  The records USTR has withheld from plaintiffs pursuant to Exemption 5 consist of:  e-mails, in which authors attach and discuss drafts of the as-yet unadopted ACTA text, and suggest, comment, analyze, and advise on proposed language and specific provisions of the draft texts and goals of the ACTA; the draft negotiating texts of the ACTA itself, which incorporates back-and-forth proposals, comments, and analyses among agency staff made in the process of creating and revising the drafts; e-mails in which USTR seeks, and receives, the advice of agency counsel on proposed ACTA provisions; and other documents regarding the ACTA negotiating process, including discussion papers, talking points, draft "Questions and Answers," draft press releases, issue papers, charts detailing the negotiating process, draft language, meeting details, draft ACTA proposals with commentary and observations, and drafts presenting recommendations and options on the ACTA process, many of which contain considerable handwritten notes made by USTR staff.  (See McCoy Decl. ¶¶ 51-68 & Attach. E.)

1.     The Attorney-Client Privilege

As noted above, USTR has withheld the sixty pages contained in Group 6 of defendant's Vaughn Index in full pursuant to the attorney-client privilege of Exemption 5 of the FOIA.  (See id. ¶¶ 51-68 & Attach. E.)

-36-

By incorporating the attorney-client privilege, Exemption 5 protects from disclosure under the FOIA "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." Mead Data, 566 F.2d at 252. This privilege exists because "sound legal advice or advocacy serves public ends and . . . such advice or advocacy depends upon the lawyer's being fully informed by the client." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). The privilege extends not only to facts supplied by the client to an attorney, but the attorney's advice to the client that is reflective of those facts. See, e.g., id. at 390 (explaining that privilege protects information supplied to attorney in order for attorney to provide "sound and informed advice"); Schlefer v. United States, 702 F.2d 233, 244 n.26 (D.C. Cir. 1983) (noting that privilege protects attorney's advice in order to protect secrecy of underlying facts); Hollar v. IRS, No. 95-1882, 1997 WL 732542, at *3 (D.D.C. Aug. 7, 1997) ("The attorney-client privilege encompasses information from a client to his or her attorney and advice from an attorney to a client which reflects that information").[16]

This privilege is not limited to "communications made in the context of litigation or even a specific dispute, but extends to all situations in which an attorney's counsel is sought on a legal matter." Coastal States Gas Corp. v. U.S. Dep't of Energy, 617 F.2d 854, 862 (D.C. Cir. 1980). Although the privilege "usually applies to facts divulged by a

---

[16] When the client is an agency, as is frequently the case in the FOIA context, the attorney-client privilege extends to communications between attorneys and all employees of the organization who are involved in the process of providing information to agency counsel and seeking advice based upon that information. See Upjohn, 449 U.S. at 392-97 (outlining contours of privilege); Mead Data, 566 F.2d at 253 n.24; Alexander v. FBI, 198 F.R.D. 306, 314 (D.D.C. 2000) (citing Upjohn).

-37-

client to his attorney, it also encompasses any opinions given by an attorney to his client based upon those facts, as well as communications between attorneys which reflect client-supplied information." Hunt v. United States Marine Corps, 935 F. Supp. 46, 53 (D.D.C. 1996). To prevail under the attorney-client privilege, the agency must establish that the attorney-client communication was confidential and not disclosed publicly. See id. "[C]onfidentiality may be inferred when the communications suggest that the government is dealing with its attorneys as would any private party seeking advice to protect personal interests." Coastal States, 617 F.2d at 863.

The documents withheld here under the attorney-client privilege, which are also withheld in part under the deliberative process privilege, consist of e-mails, and attachments thereto, exchanged between USTR employees and agency counsel. (See McCoy Decl. ¶¶ 51-68.) In these communications, USTR attorneys are seeking advice from agency counsel on draft negotiating texts in order to ensure the legality of certain proposed actions regarding the ACTA. (See id.) The e-mails and their attachments reflect the nature and substance of the advice USTR received from agency counsel, and the confidential facts upon which this advice was based. (See id.)

These documents clearly meet the standards of the attorney-client privilege because they reflect the confidential exchange of information regarding pending ACTA negotiations between USTR negotiators and agency counsel, as well as agency counsel advice on the ACTA proposals in light of this confidential information. (See id.) Where such exchanges of confidential information and advice based upon this information

-38-

between the agency-client and its counsel occurred, defendant appropriately withheld

these documents pursuant to the attorney-client privilege for two reasons.

First, they contain, or are based on and reflect, information that the client

organization -- USTR -- initially communicated as it sought legal advice.  Second, as Mr.

McCoy amply demonstrates, the communications are confidential, and have remained so

at all times because they concern sensitive matters associated with the ACTA

negotiations.  (See id.)  Indeed, much of this material is also protected by Exemptions 1

and 3 of the FOIA.  (See id. Attach. E.)

In light of the above, USTR respectfully submits that its invocation of the

attorney-client privilege, as incorporated into Exemption 5, was fully warranted in this

case.

## 2.    The Deliberative Process Privilege

In addition to the attorney-client privilege, USTR has protected all of the

documents in Groups 2, 3, 4, 6, 8, and 9 pursuant to the deliberative process privilege.

(See id. ¶¶ 51-68 & Attach. E.)

The Supreme Court has held that Exemption 5 of the FOIA also incorporates the

deliberative process privilege, the ultimate purpose of which is to prevent injury to the

quality of agency decision-making.  See Sears, 421 U.S. at 150-51.  This privilege ensures

"that persons in an advisory role [are] able to express their opinions freely to agency

decision-makers without fear of publicity [that might] . . . inhibit frank discussion of

policy matters and impair the quality of decisions."  Ryan, 617 F.2d at 789-90.  For this

reason, the deliberative process privilege protects the consultative functions of the

-39-

government by preserving the confidentiality of opinions, recommendations, and deliberations that comprise part of the process by which government decisions are made and government policies are formulated, and by protecting government agencies from being "forced to operate in a fishbowl." Wolfe, 839 F.2d at 773; see also Mapother v. DOJ, 3 F.3d 1533, 1537 (D.C. Cir. 1993).

To invoke the deliberative process privilege, an agency must first show that the protected information is predecisional, i.e., that it preceded any final agency policy on the matter it addresses. Coastal States, 617 F.2d at 866. The agency need not identify a specific final agency decision; rather, it is sufficient to establish "what deliberative process is involved, and the role played by the documents in the course of that process." Id. at 868. Second, an agency must demonstrate that the withheld information is deliberative, i.e., that it makes recommendations or expresses opinions on matters facing the agency. See id. at 866; see also Mapother, 3 F.3d at 1537. This privilege "covers recommendations, draft documents, proposals, suggestions, discussions, and other subjective documents" that reflect "the give-and-take of the consultative process." Coastal States, 617 F.2d at 866.

The documents withheld by USTR meet both of these requirements. As noted previously, these documents reflect the collaboration between USTR and other Executive Branch agencies, and between USTR and the cleared advisors, in the course of negotiating and drafting the ACTA. (See McCoy Decl. ¶¶ 51-68.) The withheld information contains drafts and edits, commentary on drafts, and e-mail discussions about drafts, discussion papers, talking points, draft "Questions and Answers," draft press

-40-

releases, issue papers, charts detailing the negotiating process, draft language, and
meeting details, many of which contain considerable handwritten notes made by USTR
staff, as well as extensive back-and-forth consultation on contemplated positions and
their effects on U.S. interests.  (See id. ¶¶ 51-68 & Attach. E.)  It is essential to the
successful negotiation of trade agreements that USTR have the ability to engage in fully
candid, in-depth, predecisional exchanges with other agencies and with cleared advisors
in order to obtain the full benefit of their legal and policy expertise.  (See id. ¶¶ 51-68.)

Documents that contain recommendations and predecisional deliberations
regarding an ongoing drafting and negotiating process are clearly protected by the
deliberative process privilege, as they reflect the "give-and-take" of the decisionmaking
process and readily qualify for Exemption 5 protection as predecisional and deliberative.
See Coastal States, 617 F.2d at 866.  Furthermore, a key consideration, in applying the
deliberative process privilege, is the need to protect the integrity of the deliberative
process itself.  See Bureau of Nat'l Affairs, Inc., 742 F.2d at 1497.  Disclosure of the type
of information withheld by USTR, especially inasmuch as it relates to the drafting and
development of an as-yet unadopted negotiating text, could reasonably be expected to
inhibit an agency's decisionmaking process, as agency officials and cleared advisors
would be less inclined to provide their frank written recommendations to their colleagues
if they had to be concerned about public disclosure.  See Marzen v. HHS, 825 F.2d 1148,
1155 (7th Cir. 1987) (finding that Exemption 5 "protects not only the opinions, comments
and recommendations in the draft, but also the process itself"); Gerstein v. CIA, No. 06-
4643, 2008 WL 4415080, at *16 (N.D. Cal. Sept. 26, 2008) (protecting draft letters);

-41-

Donham v. U.S. Forest Service, No. 07-111, 2008 WL 2157167, at *5 (S.D. Ill. May 21,

2008) (finding draft documents to be "precisely the kind of documents that Exemption 5

and the deliberative process privilege seek to protect from disclosure").

     In sum, all of the information in Groups 2, 3, 4, 6, 8, and 9 withheld by USTR

pursuant to the attorney-client and deliberative process privileges, as incorporated by

Exemption 5, are clearly the type of information intended to be covered by these

privileges and this exemption.  Therefore, USTR respectfully submits that its use of

Exemption 5 to withhold these records was appropriate.

     V.    USTR Provided Plaintiffs with All Reasonably Segregable
            Portions of the Responsive Records

     The FOIA imposes an obligation on agencies to release any reasonably segregable

portions of records.  See 5 U.S.C. § 552(b); see also Billington v. DOJ, 233 F.3d 581, 586

(D.C. Cir. 2000) (explaining that "[t]his segregability requirement limits claims of

exemption to discrete units of information; to withhold an entire document, all units of

information in that document must fall within a statutory exemption"); Trans-Pacific

Policing Agreement v. U.S. Customs Serv., 117 F.3d 1022, 1027 (D.C. Cir. 1999) (stating

that "[i]t has long been a rule in this Circuit that nonexempt portions of a document must

be disclosed unless they are inextricably intertwined with exempt portions").  Agency

affidavits are sufficient for segregability purposes where they "'show with reasonable

specificity why the documents fall within the exemption.'"  Quinon v. FBI, 86 F.3d 1222,

1227 (D.C. Cir. 1996) (quoting Hayden v. NSA, 608 F.2d 1381, 1387 (D.C. Cir. 1979)).

     USTR fulfilled these requirements by conducting a review of each page of the

responsive records at issue, and has determined that all reasonably segregable information

-42-

has been disclosed to plaintiffs.  (See Maruyama ¶ 9; McCoy ¶¶ 39-46,51-68.)    In fact,

USTR has obtained the consent of participating governments to release certain ACTA

documents, such as agendas and the confidentiality agreement itself, to the public, and

consulted extensively with other agencies in order to release any non-exempt information

to plaintiffs.  (See Maruyama ¶ 9; McCoy ¶¶ 39-46,51-68.)  USTR has also made a

discretionary release of thirty-six pages pursuant to its April 30, 2009 supplemental

response to plaintiffs.[17]  (See McCoy ¶¶ 39-46; 51-68.)

---

[17]  This supplemental disclosure included a document prepared by USTR for the TPSC to launch the ACTA negotiations, the first time a "TPSC paper" has been released.  (See McCoy Decl. ¶ 27.)

-43-

<u>Conclusion</u>

For the foregoing reasons, and based upon the entire record herein, defendant

respectfully submits that its motion for summary judgment should be granted.

Respectfully submitted,


_____

JEFFREY A. TAYLOR
(DC Bar #498610)
United States Attorney


_____

RUDOLPH CONTRERAS
(DC Bar #434122)
Assistant United States Attorney


_____/s/_____

Dated:  May 28, 2009                    Vanessa R. Brinkmann
                                        Attorney-Advisor
                                        Office of Information Policy
                                        United States Department of Justice
                                        1425 New York Ave., N.W., Suite 11050
                                        Washington, D.C.  20530-0001
                                        (202) 616-5462