UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC FRONTIER | ) | |
| FOUNDATION, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-1599 (RMC) |
| | ) | |
| OFFICE OF THE UNITED STATES | ) | |
| TRADE REPRESENTATIVE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

I, Stanford McCoy, declare and state as follows:

1.      I am the Assistant United States Trade Representative ("AUSTR") for Intellectual

Property and Innovation.  USTR is responsible for developing and coordinating U.S.

international trade, commodity, and direct investment policy, and overseeing negotiations with

other countries. The head of USTR, the U.S. Trade Representative, serves as the President's

principal trade advisor, negotiator, and spokesperson on trade issues.  USTR is part of the

Executive Office of the President. Through an interagency structure, USTR coordinates trade

policy, resolves disagreements, and frames issues for presidential decision.

2.      I have been the AUSTR for Intellectual Property and Innovation since March 2, 2008.  In

my current position,  I am the chief policy advisor to the USTR and the Administration agencies

on intellectual property and trade issues and am responsible for developing and implementing

United States trade policy on intellectual property rights ("IPR").  From 2006-2008, I served as

Chief Negotiator and Deputy Assistant U.S. Trade Representative for Intellectual Property

Enforcement in the Office of Intellectual Property and Innovation at USTR.  I personally headed the U.S. delegation at the first four rounds of the Anti-Counterfeiting Trade Agreement ("ACTA")  negotiations, and at several preliminary meetings before the negotiations started.  I am now responsible for supervising all trade negotiations on intellectual property matters, including the ACTA negotiations.  My experience as a negotiator and, more specifically, as the chief ACTA negotiator for the United States places me in a position to determine the potential harm of releasing records related to the negotiation.

3.      I am an Original Classification Authority, as designated by the USTR pursuant to an assignment of authority from the President under Executive Order 12,958, as amended by Executive Order 13,292 ("the E.O.").   I make the following statements based on my personal knowledge, which in turn is based on a personal review of the records in the case file that USTR established to process the FOIA request in this case, and on information furnished to me in the course of my official duties.

4.      USTR provided 159 pages of records to Electronic Frontier Foundation ("EFF") in response to its FOIA request on November 14, 2008, and January 16, 2009.  USTR withheld 1,362 pages of records.  USTR subsequently reexamined all of the records withheld in light of a memorandum issued by the Attorney General on March 19, 2009, to heads of executive departments and agencies regarding the evaluation of records for potential release to the public ("Attorney General Holder's FOIA Guidelines").  The reexamination was conducted after consultations between my office, the USTR FOIA Office, and the Office of the General Counsel ("OGC").  My declaration also addresses the reexamination of the records in question and

2

supplements, and incorporates by reference, the January 16, 2009, declaration of former General Counsel Warren Maruyama ("Maruyama Declaration") regarding the classification of documents. After a comprehensive review, I found no reason to retract or revise any of the conclusions or statements by former General Counsel Maruyama.  However, in light of Attorney General Holder's FOIA Guidelines, USTR did release some additional records to EFF.  Upon further review, we also now assert an additional exemption for certain records previously withheld.  In an effort to respond to requests for increased transparency regarding the ACTA negotiations, USTR and its negotiating partners released to the public a summary of issues under consideration in the ACTA negotiations.

5.     I determined that the records reviewed and addressed in the Maruyama Declaration must continue to be protected as classified under the E.O. as they contain Foreign Government Information and would damage national security if released, for the reasons discussed in this Declaration.  I also have determined that releasing records reflecting interagency communications and communications with members of a federally chartered private sector advisory committee would be harmful.  Finally, I have determined that contact information for employees of the Executive Office of the President should also continue to be withheld.

## I.      BACKGROUND

### A.    ACTA

6.     In order to understand the elements and response to the FOIA request at issue, a brief summary of the ACTA is appropriate.  Global counterfeiting and piracy has been a growing trade

policy concern for the United States and many of our trading partners.  In order to address this

concern, USTR has made it a priority to work closely with U.S. trading partners to ensure that

they provide strong intellectual property enforcement regimes.  For example, USTR was among

the leaders in the effort to include enforcement provisions in the World Trade Organization's

Agreement on Trade-Related Aspects of Intellectual Property Rights ("TRIPS Agreement")

during the Uruguay Round of global trade negotiations, the results of which entered into force in

the United States in 1995.  At the direction of Congress, USTR also has reported annually for the

past 20 years on the adequacy and effectiveness of IPR protection and enforcement by U.S.

trading partners.

7.      While the TRIPS Agreement sets basic requirements for WTO members to enforce their

IPR laws, governments and rightholders face many new challenges, such as the speed and ease of

digital reproduction, and the growing sophistication and resources of international counterfeiters.

In the view of the United States and a number of its trading partners, these challenges call for a

level of international cooperation and commitment that goes beyond the minimum standards of

the TRIPS Agreement.

8.      The United States has pursued a number of trade policy initiatives aimed at addressing

the problems of counterfeiting and piracy.  For example, the United States has concluded

multiple free trade agreements ("FTAs") that include strong IPR enforcement provisions similar

to U.S. law.   Also, in October 2004, the United States began the Strategy Targeting Organized

Piracy ("STOP") Initiative, which called for efforts by multiple agencies to fight counterfeiting

and piracy.  In the area of trade policy, STOP called for reaching out to trading partners and

building international support to block bogus goods.  As part of that effort, in 2005 USTR led

interagency teams to meet with key trading partners to advocate closer cooperation in fighting

piracy and counterfeiting, and to advocate sharing of "best practices" for strong legal

frameworks.

9.    Building on these efforts, USTR in May 2006 encouraged the interagency Trade Policy

Staff Committee ("TPSC"), a committee representing the interests of twenty U.S. government

agencies, to endorse the concept of a multi-party, "TRIPS-plus" ACTA.  In particular, USTR

proposed that a group of leading IPR-protecting nations could work together to set a new

standard for IPR enforcement that was better suited to contemporary challenges, both in terms of

strengthening the relevant laws and in terms of strengthening various frameworks for enforcing

those laws.  The interagency TPSC concurred with USTR's recommendation that USTR begin

contacting trading partners to join a plurilateral ACTA.

10.    USTR began by approaching the Government of Japan, which had expressed interest.  By

2007, discussions were underway among an initial group of interested parties, including Canada,

the European Union, and Switzerland, Japan and the United States, regarding areas that might be

addressed in an eventual agreement.  Over time, the group grew to include Australia, the

Republic of Korea, Mexico, Morocco, New Zealand, and Singapore.  To date, the group has held

four rounds of negotiations.  On April 6, 2009, the ACTA parties released a summary of the

issues currently under consideration.

**B.    CONFIDENTIALITY AGREEMENT**

11.     In order to promote the most productive negotiating environment amongst the ACTA trading partners, the ACTA parties decided to conclude a confidentiality agreement applicable to the negotiations was needed.  Therefore, in my review of the records I took that agreement into consideration with respect to § 6.1 (r)(2) of the E.O. as well as Attorney General Holder's FOIA Guidelines.  This agreement was explicit in its direction and intent.  It states:

> First, we agree that documents relating to the proposed Anti-Counterfeiting Trade Agreement (ACTA) will be held in confidence.  This means that the documents may be given only to government officials or persons outside government who participate in the party's domestic consultation process and have a need to review or be advised of the information in these documents.  Anyone given access to the documents will be alerted that they cannot share the documents with people not authorized to see them.  The United States plans to hold ACTA documents in confidence for a fixed period of time after negotiations conclude . . . .

12.     Based on my personal knowledge of the records that USTR has withheld in this case and how they were received and handled, I can confirm that e-mails and shared negotiating records were provided to USTR by the governments of our trading partners as a result of a mutually agreed confidentiality agreement and were treated as Confidential Foreign Government Information.  As a result, I concluded the records withheld would cause harm to national security if released, for the reasons discussed in this Declaration.

## C.     FORMULATION OF DRAFT TEXTS

13.     After adopting the confidentiality agreement, the ACTA trading partners began creating a working text of the agreement.  In my experience, of paramount importance to a successful negotiation is an environment in which negotiating partners can exchange ideas, draft texts, draft comments on texts, and other negotiating records, with the understanding that these exchanges

will be held in confidence.  When negotiating partners function in an environment of confidence,
they are freer to engage in the give-and-take that is necessary to reach a successful conclusion.  As
explained in the Maruyama Delcaration, successful negotiations are grounded in trust among the
negotiators, and any breach of that trust can lead to a situation in which negotiating partners are
more likely to adopt and maintain rigid negotiating positions that are unfavorable to U.S.
economic interests.

14.     In order to develop the U.S. positions in trade negotiations, USTR engages in an extensive
consultative process with other relevant federal agencies.  Based on its experience negotiating free
trade agreements and conducting multilateral intellectual property negotiations, USTR has
identified those agencies that have key interests in each major issue area under negotiation.
USTR consults with those agencies to prepare a draft text that is then circulated to the interagency
TPSC.  In response, agencies may offer comments on the draft text, leading to an additional round
of drafting within USTR.  It is essential for USTR to have the ability to engage in candid, in-
depth, predecisional exchanges with these agencies in order to obtain the full benefit of their legal
and policy expertise.

15.     USTR also consults with an additional set of advisors, as required by statute.  By law, the
President is required to seek information and advice from representative elements of the private
sector with respect to, among other things, the development, implementation, and administration
of U.S. trade policy, including from advisory committees.  By statute, this information and advice
may be held in confidence, to be disclosed *upon request* to specified government officials and
other advisory committees. (19 U.S.C. 2155(g)).  The relevant legislative history for this statute

reflects the view that this advice is exempt from disclosure under FOIA.  (Senate Report No. 93-1298, *reprinted in* 93 USCCAN at 7251).

16.    To implement Section 2155(g), the President established a comprehensive industry trade advisory committee (ITAC) system, with subcommittees devoted to specific areas.  One committee, ITAC-15 addresses IPR.  Intellectual property is a highly technical and complex area of the law and an important part of the U.S. trade agenda.  ITAC-15 provides valuable information and technical expertise to USTR that allows USTR to more effectively address intellectual property concerns around the world.  ITAC members have security clearances.  (We therefore refer to them as our "cleared advisors".)  Members of ITAC-15 include representatives from the software, recording, movie, and publishing industries, as well as the Global Health Council.  To solicit views from ITAC members, USTR posts documents on a secure website, and individual members can access the documents and provide comments directly to individual USTR officials.  ITAC comments may range from technical comments on wording choices in draft negotiating texts to overall U.S policy on trade-related IPR issues.

17.    In the case of ACTA, the President, through USTR, solicited views from the ITAC-15 advisors, including by posting draft ACTA negotiating texts on the secure website and inviting the advisors to provide comments on the texts.  Advisors from other advisory committees, including representatives from public interest groups such as Consumers Union, also have access to these texts, and some members of the advisory committees have provided comments.

18.    Section 2155(g) specifies that "[p]rivate organizations or groups, including those whose interests may not be fully represented by any of the formally constituted advisory committees"

have the "opportunity to submit pertinent information and recommendations on an informal basis to U.S. negotiators."  (19 U.S.C. 2155(j)).  To ensure that these groups have an opportunity to submit their views on the ACTA, USTR issued a  Federal Register  notice on February 15, 2008, inviting public comment on the ACTA, and numerous organizations, including Plaintiffs, submitted comments.  USTR posted these comments on its website.  In addition, USTR has held meetings with interested groups at their request.  USTR has met with a wide range of companies, trade associations, and non-governmental organizations (including both EFF and Public Knowledge).  USTR also held a public meeting on ACTA on September 22, 2008.  USTR announced that meeting through a Federal Register notice published on September 5, 2008.  USTR again solicited public comments in the September 5 notice, and again posted the comments received on the USTR web site.  USTR has considered the diverse points of view of these various stakeholders in formulating policy relating to ACTA.


## II.____ADMINISTRATIVE HISTORY OF THE FOIA REQUEST

19.     A chronology and the history of the FOIA request, our search, and our response is provided to put this matter in context.

20.     On June 11, 2008, Plaintiffs submitted a FOIA request to USTR.  On July 24, 2008, after a conversation with USTR staff, Plaintiffs filed a modified request that narrowed the scope of the records sought.

21.     On September 17, 2008, Plaintiffs filed a complaint with this Court under FOIA, requesting injunctive, declaratory, and other relief.

22.     On November 14, 2008, we filed our response.  We disclosed 54 records.  Some of these records disclosed were protected by the confidentiality agreement we reached with the other ACTA negotiating partners.  However, after reviewing the documents carefully, we considered that, from the U.S. point of view, release of some of the documents would not harm the negotiations.  In light of the confidentiality agreement, we consulted with our partners and asked them to agree to release the records in question, and they agreed.  We stated that we were awaiting third party responses to determine whether additional documents could be released.  We also advised that we would prepare a final response and indicate any records we were withholding and the reason for doing so.  (See Attachment (A)).

23.     On December 22, 2008, we filed an interim response.  Based on a review of 806 pages of records.  We withheld 313 pages of records in full based on Exemption 1 of the FOIA regulations[1].  We also withheld 186 e-mail chains, totaling 493 pages, in full based on Exemption 5, noting that Exemption 1 might also apply to these pages.  Finally, we noted that to the extent the withheld records contained private e-mail addresses, such information was also protected by Exemption 6.  We advised Plaintiffs that we would be filing a final response. (See Attachment (B)).

24.     On January 16, 2009, we filed our "final response."  We disclosed an additional 14 pages of records, four of which were redacted pursuant to Exemptions 5 and 6.  In addition, we noted that 580 pages were withheld in full pursuant to Exemption 1, as well Exemption 5.  We did

---

[1]5 U.S.C. § 552 (2000 & Supp. IV 2004) (citing Exemptions 1, 2, 3, and 5 throughout the Declaration that allow for the protection of material from disclosure to the public).

not include in these totals any pages of records that were non-responsive. (See Attachment (C)).

25.     On January 30, 2009, at the request of plaintiffs, we asked that these proceedings be stayed until we received further guidance from the Justice Department on President Obama's FOIA memorandum of January 21, 2009.  On February 3, 2009, the Court agreed.

26.     On March 19, 2009, Attorney General Holder's FOIA Guidelines were released to heads of executive departments and agencies providing guidance as to how such departments and agencies should evaluate releasing records under FOIA.  In particular, the memorandum specified that the Department of Justice would defend withholding records under FOIA only if the agency "reasonably foresees" that disclosure would harm an interest protected by one of the statutory exemptions, or that disclosure is contrary to law.  After Attorney General Holder's FOIA Guidelines were issued, we conducted a de novo review of all of the records, including e-mails, that we had withheld or withheld in part.  In the course of this review, we had extensive discussions within USTR (including three meetings at the senior staff level), with our interagency colleagues, and with our cleared advisors with a view toward assessing the harm of releasing certain records that had previously been withheld.  Where an objection was raised to releasing a particular record, we evaluated whether the harm in releasing the record was speculative or foreseeable and whether the record could be redacted in such a manner as to mitigate the harm.

27.     As a result of that review, on April 30, we released an additional 36 pages of records as a matter of agency discretion.  As part of that release package, we released certain types of records that the agency had previously considered inappropriate for release.  For example, we released, with redactions, a paper that USTR had prepared for the interagency TPSC to launch the ACTA

negotiations.  Although much, if not all, of the information released was interagency discussion

prior to the finalization of draft text, we concluded that releasing the unredacted portions of the

TPSC paper would not hamper the negotiations or the impair future interagency deliberations.

(See Attachment (D)).

28.    The records we continue to withhold are described in the attached <u>Vaughn</u> index. (See

Attachedment (E)).


III.    THE SEARCH FOR RESPONSIVE RECORDS

29.    In order to respond fully to the FOIA request, USTR took into account the formulation of

draft texts and how they were communicated, negotiated, and compiled.  After a comprehensive

search, USTR located hard copies of records responsive to the request.  With respect to the

electronic search for e-mails, USTR initially searched for all records containing the term "ACTA"

and that search yielded some 30,000 records.  Through counsel, we advised Plaintiffs on

November 7, 2008 of the size of the search.  We proposed refining the search by using the terms

"text", "civil", "criminal", "internet", and "border" in the subject lines of the e-mails and further

proposed that, once the search was complete, USTR would review the results for responsiveness

and the application of FOIA exemptions.  Plaintiffs generally agreed with this approach, but asked

that the terms "statutory damages" and "anti-circumvention" be included in the search.  USTR

also included the terms "TPM" and "damages."  Using all of these terms, USTR's search yielded

1,368 records.

30.    To identify those records containing Foreign Government Information, my staff and I

searched the located records for e-mail addresses that ended with foreign government e-mail

extensions (*e.g.* ".jp") and initiated several electronic and manual scans to search for references to

individual foreign government participants in the ACTA negotiations.  These procedures yielded

65 records that we identified as being received from, and exchanged with, foreign participants in

the ACTA negotiations.  In addition to the 65 e-mail records, my staff and I, working with the

USTR FOIA Office and USTR's OGC, reviewed 106 paper records.  We then reviewed each of

the records to determine whether the records contained Foreign Government Information and

whether the records contained any segrable information that could be released.

31.     USTR also reviewed the records to identify any interagency communications and

communications with industry, including industry representatives on our advisory committees.


**IV.____RECORDS WITHHELD UNDER 5 U.S.C. § 552 (b)(1) (Exemption 1)**

32.      USTR has withheld certain records  because they contain classified "Foreign Government

Information." These records consist of negotiating documents, including draft negotiating

proposals and records in support of such proposals, and associated e-mail messages that USTR

negotiators and attorneys received from or transmitted to officials, including foreign government

officials, in the course of planning for and carrying out negotiations to conclude the ACTA.

33.     Before circulating formal textual proposals in the ACTA negotiations, the United States

and the other governments participating in the negotiations concluded a written agreement based

on a U.S. proposal of December 2007 ". . . that documents relating to the proposed

Anti-Counterfeiting Trade Agreement (ACTA) will be held in confidence."  The U.S. proposal

was prepared by USTR's Office of the General Counsel, at my request, based on my understanding of the confidentiality expectations of our ACTA trading partners as conveyed in preliminary discussions with them as well as similar U.S. expectations.  I personally negotiated the confidentiality agreement.

34.     Then-USTR General Counsel Warren Maruyama classified the ACTA negotiating texts that USTR produced and received based on this agreement.  Mr. Maruyama issued a memorandum to U.S. ACTA negotiators on February 8, 2008, noting that the governments participating in the ACTA negotiations had agreed to hold records exchanged in the course of those negotiations in confidence.  In the memorandum, Mr. Maruyama determined that all such records were to be classified as Confidential Foreign Government Information.

35.     The records that USTR has withheld on the basis that they contain Foreign Government Information reflect information that USTR negotiators and attorneys sent to or received from other governments in the course of the ACTA negotiations.  USTR negotiators marked as "Confidential" all textual proposals sent to other ACTA participants at the time they were prepared.  After a reexamination, I confirm that these records continue to warrant classification at the "Confidential" level, in as much they contain Foreign Government Information and could be expected to cause harm to national security if released, for reasons discussed in this Declaration.

36.     USTR's analysis of the classified information contained in the withheld records is based on the standards articulated in the FOIA statute, 5 U.S.C. § 552 (b)(1), and the E.O.  USTR's OGC provided legal guidance in connection with this review and for purposes of ensuring that the records containing classified information were all properly marked in accordance with the E.O.

14

procedures.

## A.     REEXAMINATION OF STATUS OF "FOREIGN GOVERNMENT INFORMATION"

37.    Furthermore, in reviewing these ACTA records, I personally verified that OGC determined

that the records were properly classified.  I reexamined these classified records and assessed

whether any were appropriate for declassification and/or release and confirmed they contained

Foreign Government Information.  I verified that OGC had determined that the requirements of

the E.O. were met and that any reasonably segregable portion of these classified records, which

did not meet the standards for classification, was declassified and marked for release, unless

withholding was otherwise warranted under applicable law.

38.    After a reexamination, I have determined that all of the records withheld from the

Plaintiffs should remain classified as "Foreign Government Information" under category 6.1(r)(1)-

(2) of the E.O.  "Foreign government information" means:

(1) information provided to the United States Government by a foreign government or

governments, an international organization of governments, or any element thereof, with the

expectation that the information, the source of the information, or both, are to be held in

confidence;

(2) information produced by the United States Government pursuant to or as a result of a

joint arrangement with a foreign government or governments, or an international

organization of governments, or any element thereof, requiring that the information, the

arrangement, or both, are to be held in confidence;...

15

**B.     REEXAMINATION IN LIGHT OF THE HOLDER GUIDELINES**

39.    In addition, considering whether particular records contained classified Foreign

Government Information, my own review also carefully considered the impact that disclosure of

particular records containing Foreign Government Information would have on the foreign

relations of the United States.  I determined the records should remain classified due to the

potential harm if released for reasons discussed in this Declaration.

40.    Based on longstanding practice, foreign governments expect that we will hold in

confidence the negotiating texts - including requests, offers, position papers, and analyses that we

exchange with them.  Foreign governments are not likely to engage in the give-and-take necessary

to conclude agreements with us if we do not keep these records confidential.

41.    Specifically, as a trade negotiator, I considered the potential harm to U.S. objectives in the

ACTA negotiations.  The objective of the ACTA negotiations is to negotiate a new, state-of-the-

art agreement to combat counterfeiting and piracy.  As noted, the United States has been working

with several trading partners, including Australia, Canada, the European Union and its 27 member

states, Japan, Mexico, Morocco, New Zealand, Singapore, South Korea, and Switzerland, to

negotiate the agreement.  When it is finalized, the ACTA is intended to assist in the efforts of

governments around the world to more effectively combat the proliferation of counterfeit and

pirated goods, which undermine legitimate trade and the sustainable development of the world

economy, and in some cases contribute to organized crime and expose American families to

dangerous fake products.

16

42.    The aforementioned confidentiality arrangement with our ACTA partners prohibits us from unilaterally disclosing ACTA negotiating records including proposals we have submitted to them.  Based on my personal knowledge of trade negotiations, in general, and the ACTA negotiations, in particular, I am confident that a unilateral disclosure would have several consequences that would be harmful to U.S. interests.

43.    I also am confident that a unilateral disclosure would undermine trust in our reliability as a negotiating partner in the ACTA negotiations, and raise questions about the willingness or ability of the United States in other negotiations to keep sensitive U.S. or foreign negotiating positions confidential.  In the absence of mutual trust, I expect that our negotiating partners will be more likely to adopt and maintain rigid negotiating positions unfavorable to U.S. economic and security interests, significantly reducing the prospects for compromise and eventual agreement on terms favorable to the United States.  Even if we limit the records we release to our own proposals, I expect that our negotiating partners may well view such a disclosure as an unfair effort to entrench our positions by generating domestic pressure to resist giving ground.  That, in turn, could cause U.S. negotiating partners to adopt similar tactics, dimming prospects for compromise and eventual agreement.

44.    On the other hand, we can reinforce mutual trust, and potentially advance U.S. goals in the negotiations, by working cooperatively with our partners to release information on a consensus basis.  Our mutual release of the ACTA summary on April 6 reflects such a cooperative approach.  The summary represented the most comprehensive joint effort to date of all of the participants in the negotiation to provide information on the ACTA to the public.  In connection with the release

of the summary, USTR issued a public statement noting that the release reflected the Obama Administration's commitment to transparency.

45.     Further, the agreement that governments reached to preserve the confidentiality of records exchanged in the course of the ACTA negotiations is designed to enable officials of participating governments to engage in frank exchanges of views, positions, and specific negotiating proposals. The confidential nature of those exchanges will facilitate the resolution of differing national interests and perspectives and will lay the groundwork for an eventual agreement.

46.     A unilateral release with redactions would still cause foreseeable harm to national security, for reasons discussed in this Declaration.  Even if documents were to be released, without identifying the originating government, the danger remains that if the information were to be made public, the originating government would likely recognize the information as material it supplied in confidence, and view its unilateral release as a breach of trust.  Thereafter, foreign governments would be reluctant to entrust the handling of their information to the discretion of the United States.  One could reasonably expect strained relations between the United States and the foreign governments, leading to diplomatic, political, or economic repercussions.  A breach of the relationship of trust between the U.S. and foreign governments could be expected to have a chilling effect at the least on the free flow of vital information.

## V.     RECORDS WITHHELD UNDER 5 U.S.C. SECTION 552(b)(2) ("Exemption 2")

47.     We are withholding e-mail addresses and other contact information for individual USTR staff members, as well as the telephone bridge line for the agency and applicable conference call

18

participant code, pursuant to Exemption 2, which exempts from mandatory disclosure records that are related to solely to the internal personnel rules and practices of an agency.  USTR is part of the Executive Office of the President ("EOP") and its e-mail services are provided by the Office of Administration of the EOP.  All EOP offices use the same e-mail format.  The release of e-mail addresses of USTR employees would not only cause harm by subjecting USTR employees to a barrage of unsolicited e-mails, but would also reveal how one could send e-mails to any employees within the EOP, including White House employees, based on only knowing an employee's name.  Further, release of telephone information could lead to the EOP's computer/phone systems being overwhelmed, or harassment which would prevent USTR staff from carrying out essential business, all of which would be harmful.

48.     The EOP is uniquely susceptible to these harms, and therefore the EOP protects contact information.


## VI.     DOCUMENTS WITHHELD UNDER 5 U.S.C. SECTION 552(b)(3) ("Exemption 3")

49.     The communications we have received from our cleared advisors are being withheld pursuant to Exemption 3.  The Trade Act of 1974, which establishes the advisory system, provides for information or advice regarding trade policy or negotiations to be submitted in confidence to the U.S. government or to an advisory committee and specifies the circumstances under which that information or advice can be disclosed.  (19 U.S.C. 2155(g)).  Section 2155(g) provides that the information or advice may be disclosed to certain government officials, certain Congressional officials, and the advisory committees themselves.  In its report on the 1974 Trade Act, the Senate

19

Finance Committee stated that this limitation on disclosure establishes an exemption from FOIA, expressing the view that the exception was necessary, given the nature of the information and its importance to the ability of the United States to negotiate in an effective manner.   In light of the statutory and legislative background, USTR has implemented, and the cleared advisors have participated in, this advisory system with an understanding that communications exchanged would be held in confidence.

50.     The records in question were communications from advisors on ITAC-15 sent to USTR based on a number of ACTA negotiating documents that USTR posted on the secure cleared advisor website.  After reviewing the documents, a number of the cleared advisors provided USTR with comments on those documents, and in some cases, on the negotiations more broadly. These comments assisted us in revising text and considering alternative policy choices as the negotiations moved forward.  We value the technical and policy expertise of our cleared advisors on ITAC-15, many of whom represent industries severely affected by IPR violations.  It should be noted that our cleared advisors may also respond in a public fashion to USTR's Federal Register notice seeking public comments on ACTA negotiations.  Therefore, they have already shared with the public the views they considered appropriate to so share.  To release the communications they sent to USTR in confidence would discourage them from providing candid advice through the cleared advisor system, contrary to Congress' express view that such advice is a necessary component of having trade negotiations that achieve U.S. objectives.


**VII.    RECORDS WITHHELD UNDER 5 U.S.C. SECTION 552(b)(5) ("Exemption 5")**

51.    The records we are withholding under Exemption 5 are of two types. The first type is communications with other agencies. These agencies are: the Department of Commerce, the Department of Homeland Security, the Department of Justice, the Department of State, the National Security Council, and the Library of Congress.

52.    The second type involves communications with our cleared advisors pursuant to the Congressionally-mandated industry advisory committee. As described above, Congress requires the President to seek policy, technical, and other advice from, among others, our industry advisory committee. Congress requires USTR to do so to "the maximum extent feasible . . . before the commencement of negotiations." Accordingly, during the ACTA negotiations, we have submitted draft negotiating texts for consideration by members of an advisory committee, and they have provided us confidential advice in response.

53.    My staff, and OGC and I reviewed all records carefully to determine whether any could be released, including release in part. Where we identified such records, we consulted with the author on the release of the record.

54.    The records being withheld fall into nine categories, as reflected in the Vaughn Index. Attached to this declaration is the Vaughn Index containing a detailed description of the withheld documents. Because certain records are similar to one another, we have categorized them into nine distinct groups. The Vaughn Index describes the responsive documents contained in each group, including such information as the date and the general content of the material, provides the number of pages for each group, and identifies the Exemptions and/or privileges – Exemptions 1, 2, 3, and 5 (deliberative process and attorney-client privileges) – which protect each group from

full or partial disclosure under the FOIA.  For  six of these categories, we are claiming Exemption

5, in full or in part.

 Group 2

55.____This category includes e-mail chains among interagency colleagues involved in the ACTA

negotiations.  The authors attach and discuss drafts of the as-yet unadopted ACTA text.  The

authors also suggest and comment on proposed language and discuss their analyses of specific

provisions of the draft texts.  These records are deliberative because they discuss the appropriate

language to be used in draft text.  These comments explore proposed text, including providing

advice on what text should be included, what text should be deleted, or whether different phrasing

should be used.  For example, such material can reveal the existence of questions or divergent

viewpoints that were appropriately considered internally before reaching a consensus U.S.

Government position, but the existence of which could undermine that U.S. consensus position, if

disclosed to trading partners who disagree with the U.S. position

56.      For the most part, however, these communications are limited to discussions of proposed

text.  These discussions occurred prior to deciding what text the United States would agree to

propose in connection with a particular negotiation, and in some cases involve text that the United

States decided not to propose.  Releasing records would weaken the ability of USTR to speak with

one voice on behalf of the U.S. Government, for example by exposing divergent preliminary

views among and within agencies over the optimal phrasing of particular obligations, or

preliminary differences about how to handle a particular issue.  Releasing these records would

also harm USTR's ability to obtain candid and complete legal advice, strategic advice, and other

written guidance from officials of federal agencies, who have subject matter expertise on which USTR relies in formulating negotiating positions and drafting text.

Group 3

57.     This category includes draft negotiating texts of the ACTA, attached to the interagency e-mails in Group 2.  They contain agency mark-ups and commentary on draft ACTA text.  As such, the comments do not contain factual information.  As with Group 2, the comments were made prior to the finalization of any ACTA text.  The comments were made prior to proposing draft ACTA text, and in some cases address text that the United States ultimately decided not to propose.  As with Group 2, releasing these records would expose divergent viewpoints and debate among agencies prior to the development of a consensus U.S. position.  Releasing these records would harm USTR's ability to obtain written guidance from officilas of other federal agencies, who have subject matter expertise upon which USTR relies in formulating negotiating positions and drafting text.

Group 4

58.     This category consists of an e-mail chain presenting the views of a federal agency official in a blog entry.  The author presented her views, and the blog entry, by replying to an unrelated e-mail chain that is otherwise being withheld under Group 2.  Releasing the redacted portions of the e-mail exchanges would be harmful for several reasons.  First, some of the discussion that is redacted reveals certain U.S. negotiating sensitivities.  Second, the redacted discussion relates to whether a particular agency has comments on the draft text, which is clearly identified as addressing "border measures."  Whether an agency has comments on the underlying text is itself

part of the process of deciding what the ultimate text should be; revealing that an agency has comments on a particular text exposes the nature of the deliberative process and transmits to our negotiating partners which agencies are sufficiently concerned about a particular proposal to offer commentary on it. United States interests are best advanced when the U.S. government presents a unified front to our trading partners, rather than providing those partners with incentives to circumvent normal channels of communication to identify areas of vulnerability. The unredacted portion of this chain was released after the draft Vaughn Index was prepared.

Group 6

59.     This category includes e-mails and attachments thereto among USTR staff and attorneys from the Department of Justice, the Department of Homeland Security, and the Library of Congress, and U.S. Patent and Trademark Office, in which USTR and agency counsel were providing legal advice. In these e-mails, USTR attorneys sought advice from colleagues in other agencies on draft ACTA text, including the relationship of draft text with various provisions of U.S. law for which the agencies in question have particular legal expertise. In addition, lawyers from USTR and NSC "scrubbed" existing draft texts for textual precision. The attachments reflect the nature and substance of this advice, and the confidential facts upon which this advice was based. The comments were also made before the United States proposed draft ACTA text, and in some cases involve text that ultimately was not proposed. Releasing these records would reveal highly sensitive discussions within the U.S. government about the amount of flexibility we have in the negotiations. In some cases, the United States has limited room to maneuver in light of agency views, and revealing the metes and bounds of those sensitivities, or even the fact of

their existence, would preclude us from achieving certain goals in the negotiation.

Group 8

60.     This category includes communications from cleared advisors on ITAC-15.  The

communications comment on the goals of the ACTA and also on specific textual proposals.  As

provided by the statute, this advice was provided to USTR in confidence.  The comments were

provided to USTR before the United States proposed draft text.  Releasing communications of

this kind would severely undermine USTR's ability to obtain written advice from cleared advisors

on trade negotiations.  Undermining the advisors ability to communicate in writring on

confidential texts would be contrary to Congress' express view, reflected in the 1974 Trade Act,

that such advice is necessary in order for the President  to advance U.S. trade interests.  ITAC-15

members with whom we consulted about the possible release of communications advised that

releasing the e-mails would complicate USTR's ability to solicit this information and advice in

the future, thus undermining the very purpose of the advisory system.  In addition, the

communications from the cleared advisors primarily contain classified Foreign Government

Information and thus would be significantly redacted anyway.

Group 9

61.     This category includes records produced by a number of the negotiating partners regarding

the ACTA negotiating process, including discussion papers, talking points, draft questions and

answers, draft press releases, issue papers, charts detailing the negotiating process, draft language,

meeting details, draft ACTA proposals with commentary and observations, and drafts presenting

recommendations and options on ACTA.  Many of these documents were distributed

25

confidentially at ACTA negotiations, and they contain handwritten comments of U.S. government officials reflecting the official's views on a particular aspect of a document.

62.     For all the aforementioned groups, we made efforts to segregate deliberative, predecisional material from material that we believed we could release.  Further, after the release of the Attorney General Holder's FOIA Guidelines providing further guidance on disclosures under FOIA, we reexamined all exchanges under Exemption 5 to ascertain whether we could release additional records without causing foreseeable harm.  We engaged in a new round of discussions with the authors of the e-mails to evaluate whether additional records could be released.  This examination led us to release an additional 36 pages of records, including the TPSC paper seeking consensus to launch the ACTA negotiations.  Indeed, in the course of examining the records, we noted that e-mails circulating draft negotiating texts to the TPSC were not within the scope of the FOIA request, which pertains only to the substance of the ACTA.  However, we recognized that Plaintiffs might benefit from seeing which records were circulated to the TPSC.

## VIII.  CONCLUSION

63.     The withheld records that contain classified Foreign Government Information should continue to be protected as confidential; their release would be harmful to national security if released for the reasons discussed in this Declaration, and there is no basis to declassify the records.   Furthermore, if the United States unilaterally discloses to the public records that it and other participants have exchanged in confidence with regard to the ACTA negotiations, it will discourage further such exchanges, undermine trust in U.S. ACTA negotiators, and make it

difficult or impossible to conclude an agreement.

64.     In my experience, foreign governments are typically willing to engage in the give-and-take of negotiations with the United States necessary to conclude trade agreements only if they can rely on assurances from the United States that negotiating texts - including proposals, position papers, analyses - and other nonpublic communications that it provides to or receives from its negotiating partners in the course of the negotiations will be protected from unilateral public disclosure.  A unilateral disclosure by the United States of its exchanges with its ACTA negotiating partners would be a breach of the reciprocal confidentiality arrangements that the United States agreed would govern the negotiations and breach the mutual trust amongst our trading partners.

65.     Disclosure could damage the future economic security of the United States by making it more difficult to achieve the goals of the ACTA negotiations, which include better protecting Americans against the harm associated with pirated and counterfeit products.  More broadly, unilateral abandonment of the understandings that existed in the ACTA negotiations could damage the future economic security of the United States by undermining our trading partners' confidence in our credibility and reliability as a negotiating partner.

66.     In short, in my capacity as the Assistant United States Trade Representative, I have reviewed the withheld records that I have described above and have determined that they continue to be classified, contain Foreign Government Information, and would cause harm if released.  It also is my conclusion that there are no segregable portions of any other of the withheld classified records that can be released.

67.     In addition, my staff and I have carefully reviewed all of the interagency communications

and all communications with our cleared advisors.  We have determined that all communications

withheld are predecisional, deliberative, and/or would cause harm to the national security of the

United States if released, for the reasons discussed in this Declaration.  Where it was possible to

disclose a record in part, we did so.  However, the very nature of the communications – discussing

negotiating strategy and textual proposals – was such that the vast majority of  factual discussions

were intertwined with discussions of strategy and Foreign Government Information.  In addition,

the statute and legislative history confirm that these communications are to be held in confidence.

68.     Finally, some of these records contain e-mail addresses and other contact information for

staff of the EOP.  Release of these records would be harmful because the EOP's computer and

phone systems could be overwhelmed or EOP staff could be subject to harassment, thus

preventing the EOP  from conducting essential business.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Stanford McCoy

# ATTACHMENT A

EXECUTIVE OFFICE OF THE PRESIDENT

OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE

WASHINGTON, D.C. 20508

.     November 14, 2008

Gwen Hinze
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110

Dear Ms. Hinze:

This is an initial response to your e Freedom of Information Act, requesting of June 11, 2008 as
amended by your fax of July 24, 2008 requesting the release of certain records concerning the
Anti-Counterfeiting Trade Agreement ("ACTA").  We have completed preliminary processing of
the records you have requested in paragraphs 1 through 5 of your July 24, 2008 modification of
your request.

Please be advised that we are releasing fifty-four (54) documents in response to your FOIA
request.

We are still awaiting a response from some third parties in order to determine whether any
additional documents can be released to you.  We expect to have a definitive answer early next
week.  At that time our FOIA office will provide you with a final response in regard to the
records requested in subparagraphs 1 through 5 of your request and inform you of the number of
records we are not disclosing and the reason for withholding them.

Should you have any questions regarding this communication, please contact Vanessa Brinkman
at (202) 616 – 5462.

Sincerely,

David Apol
Chief Counsel for
   Administrative Law

EXECUTIVE OFFICE OF THE PRESIDENT

OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE

WASHINGTON, D.C. 20508

.    November 14, 2008

Gwen Hinze
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110

Dear Ms. Hinze:

This is an initial response to your e Freedom of Information Act, requesting of June 11, 2008 as amended by your fax of July 24, 2008 requesting the release of certain records concerning the Anti-Counterfeiting Trade Agreement ("ACTA"). We have completed preliminary processing of the records you have requested in paragraphs 1 through 5 of your July 24, 2008 modification of your request.

Please be advised that we are releasing fifty-four (54) documents in response to your FOIA request.

We are still awaiting a response from some third parties in order to determine whether any additional documents can be released to you. We expect to have a definitive answer early next week. At that time our FOIA office will provide you with a final response in regard to the records requested in subparagraphs 1 through 5 of your request and inform you of the number of records we are not disclosing and the reason for withholding them.

Should you have any questions regarding this communication, please contact Vanessa Brinkman at (202) 616 – 5462.

Sincerely,

David Apol
Chief Counsel for
    Administrative Law

# ATTACHMENT B

EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE
WASHINGTON, D.C. 20508

December 22, 2008

By E-Mail

Ms. Gwen Hinze
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110

Dear Ms. Hinze:

This is an interim response to your Freedom of Information Act (FOIA) request of June 11, 2008, as amended by your fax of July 24, 2008, in which you sought certain records concerning the Anti-Counterfeiting Trade Agreement (ACTA).

In our prior letter to you dated November 14, 2008, we provided you with fifty-four documents responsive to your request. At that time, we were also continuing our search for and review of records responsive to your request.

Our records search is now complete. We have also completed our review of 806 pages of the records located pursuant to our search. I have determined that 313 pages should be withheld in full pursuant to Exemption 1 of the FOIA, 5 U.S.C. § 552 (b)(1), which pertains to information that is properly classified in the interest of national security pursuant to Executive Order 12958, as amended. In addition 186 e-mail chains, totaling 493 pages, are being withheld in full pursuant to Exemption 5 of the FOIA, which pertains to certain inter- and intra-agency communications protected by the deliberative process privilege. These e-mails do not contain any substantive information which can reasonably be segregated for release. Please be advised that some of the information contained in the 493 pages being withheld pursuant to Exemption 5 may also be protected pursuant to Exemption 1 of the FOIA; we will provide you with a final determination on the applicability of Exemption 1 to those records in our final response.

Finally, to the extent that the withheld e-mails contain private e-mail addresses, such information is also protected by Exemption 6 of the FOIA, 5 U.S.C. § 552 (b)(6), which pertains to information the release of which would constitute a clearly unwarranted invasion of the personal privacy of third parties.

We are continuing to process the remaining records, which require further consultation and review before we can provide you with a determination. We will respond to you again once our review of those documents is completed. Please note that given the voluminous amount of records, the number of responsive pages will likely change as we continue to review the records for duplicative or otherwise non-responsive material.

-2-

Although I am aware that your request is the subject of ongoing litigation and that appeals are not ordinarily acted on in such situations, I am required by statute and regulation to inform you of your right to file an administrative appeal. If you have any questions regarding this response, please contact Vanessa Brinkmann at (202) 616-5462.

Sincerely,

Elizabeth V. Baltzan
Associate General Counsel

# ATTACHMENT C

EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE
WASHINGTON, D.C. 20508

January 16, 2009

By E-Mail

Ms. Gwen Hinze
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110

Dear Ms. Hinze:

This is our final response to your Freedom of Information Act (FOIA) request of June 11, 2008, as amended by your fax of July 24, 2008, in which you sought certain records concerning the Anti-Counterfeiting Trade Agreement (ACTA).

In our prior letter to you dated December 22, 2008, we provided you with a final determination on 806 pages of records responsive to your request. At that time, we also advised you that we were continuing to process the remaining records responsive to your request, which required further consultation and review before we could provide you with a determination.

Our review of the remaining records is now complete. I have determined that ten pages are appropriate for release without excision, and copies are enclosed. Also enclosed are four pages which are appropriate for release in part, with excisions made pursuant to Exemptions 5 and 6 of the FOIA of the FOIA, 5 U.S.C. § 552(b)(5) and (6). In addition, 580 pages are being withheld in full pursuant to Exemption 1 of the FOIA, 5 U.S.C. § 552(b)(1), as well as to Exemption 5. Exemption 1 pertains to information that is properly classified in the interest of national security pursuant to Executive Order 12,958, as amended. Exemption 5 pertains to certain inter- and intra-agency communications protected by the deliberative process and attorney-client privileges. Exemption 6 pertains to information the release of which would constitute a clearly unwarranted invasion of the personal privacy of third parties. The withheld records do not contain any substantive information which can reasonably be segregated for release.

Additionally, to the extent that the withheld records contain private e-mail addresses and/or telephone numbers, such information is also protected by Exemption 6.

Finally, in our December 22, 2008 interim response, we withheld 186 e-mail chains, totaling 493 pages, pursuant to the deliberative process privilege of Exemption 5. We advised you that these e-mails may also be protected pursuant to Exemption 1, and that we would provide you with a final determination of the applicability of Exemption 1 in our final response. Please be advised that, upon further review of these e-mails, we have now determined that seven pages are protected only by Exemption 1. The remaining 486 pages are protected by both Exemptions 1 and 5.

Although I am aware that your request is the subject of ongoing litigation and that appeals are not ordinarily acted on in such situations, I am required by statute and regulation to inform you of your right

-2-

to file an administrative appeal.  If you have any questions regarding this response, please contact
Vanessa Brinkmann at (202) 616-5462.

Sincerely,

Elizabeth V. Baltzan
Associate General Counsel

Enclosures

# ATTACHMENT D

EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE
WASHINGTON, D.C. 20508

April 30, 2009

By E-Mail

Ms. Gwen Hinze
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110

Dear Ms. Hinze:

On January 16, 2009, we sent you our final response to your Freedom of Information Act (FOIA) request of June 11, 2008, as amended by your fax of July 24, 2008, in which you sought certain records concerning the Anti-Counterfeiting Trade Agreement (ACTA).

After reviewing the Attorney General's March 19, 2009 FOIA guidelines, USTR has determined to release an additional 36 pages of records as a matter of agency discretion. Included among these are emails circulating draft ACTA proposals to the interagency Trade Policy Staff Committee. We had previously considered that such emails did not relate to the substance of the ACTA, and as a result we did not include them in the page count in our final release letter. However, in reviewing the documents again, we considered it appropriate to disclose them to you.

If you have any questions regarding this response, please contact Vanessa Brinkmann at (202) 616-5462.

Sincerely,

Elizabeth V. Baltzan
Associate General Counsel

Enclosures

# ATTACHMENT E

Electronic Frontier Foundation et al. v. United States Trade Representative

Civil Action No. 08-1599 (RMC)
U.S. District Court
District of Columbia

Vaughn Index

| Group Number | Date | Description | Exemption/Privilege | Pages |
|---|---|---|---|---|
| 1 | May 2008 to September 2008 | Draft negotiating texts of the ACTA, incorporating joint proposals with and comments from foreign governments.  The draft texts contain foreign government information as designated by section 1.4(b) of Executive Order 12,958, as amended, and are marked as "confidential" in accordance with the procedural requirements of the Executive Order. | Exemption 1 in full | 313 |
| 2 | November 2007;\n\nApril 2008 to August 2008 | 186 inter-agency e-mail chains.  The agencies include USTR, DHS, DOJ, LOC, USPTO, and NSC.  The e-mail authors attach and discuss drafts (which are described below in Group 3) of the as yet unadopted ACTA text.  The authors also suggest and comment on proposed language and discuss their analyses of specific provisions of the draft texts.  The protected e-mails do not contain any substantive information which can be segregated as non-deliberative. | Exemption 5 (deliberative process privilege) in full for 491 pages\n\nExemption 5 (deliberative process privilege) in part for 12 pages\n\nExemption 1 in part | 503 |

| | | | | |
|---|---|---|---|---|
| | | In addition, some of the inter-agency e-mail chains described above forward, for discussion among agency staff, e-mail communications with representatives of foreign governments regarding the draft ACTA texts.  Other e-mails incorporate language from the draft ACTA negotiating texts.  E-mails with foreign governments, and information reflecting the ACTA negotiations, contain foreign government information as designated by section 1.4(b) of Executive Order 12,958, as amended, and are marked as "confidential" in accordance with the procedural requirements of the Executive Order. | | |
| 3 | April 2008 to August 2008 | Draft negotiating texts of the ACTA, attached to the inter-agency e-mails in Group 2, which incorporate back-and-forth proposals, comments, and analyses among agency staff pursuant to the process of creating and revising the draft negotiating texts.  The agency mark-ups and commentary reflected in these drafts reveal the decisionmaking processes of agency staff, and the draft texts contain foreign government information as designated by section 1.4(b) of Executive Order 12,958, as amended, and | Exemption 1 in full  Exemption 5 (deliberative process privilege) in part | 317 |

| | | are marked as "confidential" in accordance with the procedural requirements of the Executive Order. | | |
|---|---|---|---|---|
| 4 | November 15, 2007 | Portion of one inter-agency e-mail chain which presents the views of the authors on an ACTA draft; with some back-and-forth on comments made by other agencies. The agency authors are USPTO, DHS, and USTR. | Exemption 5 (deliberative process privilege) in part | 1 |
| 5 | May 2008 to October 2008 | E-mails communications – both inter-agency (USTR, USPTO, AND DHS) and with representatives of foreign governments – which discuss and attach draft negotiating texts of the ACTA. The draft negotiating texts, the e-mails with foreign governments, and the inter-agency e-mails reflecting ACTA negotiations contain foreign government information as designated by section 1.4(b) of Executive Order 12,958, as amended, and are marked as "confidential" in accordance with the procedural requirements of the Executive Order. | Exemption 1 in full | 45 |
| 6 | April 2008 to August 2008 | E-mails, and attachments thereto, among USTR staff and agency counsel. In these e-mails, USTR seeks, and counsel from DOJ, PTO, LOC, and DHS provides, advice on proposed ACTA provisions. Emails and attachments also contain | Exemption 5 (attorney-client privilege) in full<br><br>Exemption 5 (deliberative process privilege) in part<br><br>Exemption 1 in part | 60 |

| | | | | |
|---|---|---|---|---|
| | | "scrubbing" from USTR and NSC lawyers. The attached texts reflect the nature and substance of this advice, and the confidential facts this advice was based upon.<br><br>Some of the e-mails attach or incorporate language from the draft ACTA negotiating texts, and/or reflect the ACTA negotiations. Such e-mails contain foreign government information as designated by section 1.4(b) of Executive Order 12,958, as amended, and are marked as "confidential" in accordance with the procedural requirements of the Executive Order. | | |
| 7 | Undated | DOJ-created PowerPoint presentation entitled "Counterfeit Trademarks and Counterfeit Labels." This PowerPoint was presented to foreign government officials from ACTA partners as part of the negotiating process, with the purpose of guiding the deliberations with foreign governments on whether certain issues should be addressed in the ACTA text. As such the presentation directly reflects a subject of the ongoing ACTA negotiations and contains foreign government information as designated by section 1.4(b) of | Exemption 1 in full | 5 |

| | | | | |
|---|---|---|---|---|
| | | Executive Order 12,958, as amended, and are marked as "confidential" in accordance with the procedural requirements of the Executive Order. | | |
| 8 | April 2008 to August 2008 | Communications with Industry Trade Advisory Committee (ITAC) advisors.  The ITAC advisors provide input and advice with respect to U.S. negotiating objectives and bargaining positions on various provisions of the ACTA and, as such, reveal the preliminary exchange of ideas between advisors and agency staff with respect to the ACTA provisions under agency consideration.  Inasmuch as these communications reflect the ACTA negotiations and incorporate language from the draft negotiating texts, they contain foreign government information as designated by section 1.4(b) of Executive Order 12,958, as amended, and are marked as "confidential" in accordance with the procedural requirements of the Executive Order. | Exemption 1 in full<br><br>Exemption 3 in full<br><br>Exemption 5 (deliberative process privilege) in full | 25 |
| 9 | | Various documents regarding the ACTA negotiating process, including discussion papers, talking points, draft Q&A's, draft press releases, issue papers, charts detailing the negotiating process, draft | Exemption 1 in full<br><br>Exemption 5 (deliberative process privilege) in part | 118 |

|  |  | language, meeting details, draft ACTA proposals with commentary and observations, and drafts presenting recommendations and options on ACTA.  Many of these documents contain considerable handwritten mark-ups and marginalia made by agency staff.  The deliberations reflected in these drafts reveal the decisionmaking processes of agency staff, reflect many aspects of the ongoing ACTA negotiations, and reflect draft ACTA language and foreign government proposals.  They contain foreign government information as designated by section 1.4(b) of Executive Order 12,958, as amended, and are marked as "confidential" in accordance with the procedural requirements of the Executive Order. |  |  |

**\*\*\* Contact information for USTR officials has also been withheld pursuant to FOIA Exemption 2.\*\*\***